Filed: April 30, 2003

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

Nos. 02-1215(L)
(CA-01-26-6)

Neil J. Mellen, et al.,

                              Plaintiffs - Appellees,

        versus

Josiah Bunting, III, etc.,

                              Defendant - Appellant.

O R D E R

        The court amends its opinion filed April 28, 2003, as follows:

        On page 16, first full paragraph, line 7 -- the word "Nevada's" is corrected to read "Nebraska's."

        On page 17, first full paragraph, line 10 -- the word "Nevada" is corrected to read "Nebraska."

                              For the Court - By Direction

                              /s/ Patricia S. Connor
                                        Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

NEIL J. MELLEN; PAUL S. KNICK,
  *Plaintiffs-Appellees,*


v.

JOSIAH BUNTING, III, in his
individual capacity and in his
official capacity as Superintendent,
Virginia Military Institute,
  *Defendant-Appellant.*

SPECIALTY RESEARCH ASSOCIATES,
INC.; FIRST PRINCIPLES, INC.;                    No. 02-1215
COALITION OF AMERICAN VETERANS,
INC.; NAVAL AVIATION FOUNDATION,
INC.; THE NATIONAL LEGAL
FOUNDATION,
  *Amici Supporting Appellant.*

AMERICANS UNITED FOR
SEPARATION OF CHURCH AND STATE;
ANTI-DEFAMATION LEAGUE; THE
AMERICAN JEWISH COMMITTEE,
  *Amici Supporting Appellees.*

NEIL J. MELLEN; PAUL S. KNICK,
*Plaintiffs-Appellants,*

v.

JOSIAH BUNTING, III, in his
individual capacity and in his
official capacity as Superintendent,
Virginia Military Institute,
*Defendant-Appellee.*

AMERICANS UNITED FOR
SEPARATION OF CHURCH AND STATE;     No. 02-1267
ANTI-DEFAMATION LEAGUE; THE
AMERICAN JEWISH COMMITTEE,
*Amici Supporting Appellants.*

SPECIALTY RESEARCH ASSOCIATES,
INC.; FIRST PRINCIPLES, INC.;
COALITION OF AMERICAN VETERANS,
INC.; NAVAL AVIATION FOUNDATION,
INC.; THE NATIONAL LEGAL
FOUNDATION,
*Amici Supporting Appellee.*

Appeals from the United States District Court
for the Western District of Virginia, at Lynchburg.
Norman K. Moon, District Judge.
(CA-01-26-6)

Argued: January 21, 2003

Decided: April 28, 2003

Before KING, Circuit Judge, HAMILTON, Senior Circuit Judge,
and Morton I. GREENBERG, Senior Circuit Judge of the
United States Court of Appeals for the Third Circuit,
sitting by designation.

2

Affirmed in part and vacated in part by published opinion. Judge King wrote the opinion, in which Senior Judge Hamilton and Senior Judge Greenberg joined.

---

**COUNSEL**

**ARGUED:** William Henry Hurd, State Solicitor, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellant. Rebecca Kim Glenberg, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF VIRGINIA, Richmond, Virginia, for Appellees. **ON BRIEF:** Jerry W. Kilgore, Attorney General of Virginia, William E. Thro, Deputy State Solicitor, Maureen Riley Matsen, Deputy State Solicitor, Alison Paige Landry, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellant. Jane S. Glenn, Brian R. Jones, JONES & GLENN, Roanoke, Virginia, for Appellees. Jordan W. Lorence, Benjamin W. Bull, ALLIANCE DEFENSE FUND LAW CENTER, Scottsdale, Arizona, for Amicus Curiae Specialty Research. Ronald D. Ray, Edna Jenelle Turner, Crestwood, Kentucky, for Amici Curiae First Principles, et al. Steven W. Fitschen, THE NATIONAL LEGAL FOUNDATION, Virginia Beach, Virginia, for Amicus Curiae Foundation. Ayesha N. Khan, Ilana R. Fisher, AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, Washington, D.C.; Rosina K. Abramson, Steven M. Freeman, Erica Broido, Steven C. Sheinberg, Abbey Gans, ANTI-DEFAMATION LEAGUE, New York, New York; Jeffrey P. Sinensky, Kara H. Stein, THE AMERICAN JEWISH COMMITTEE, New York, New York, for Amici Curiae Americans United, et al.

---

**OPINION**

KING, Circuit Judge:

General Josiah Bunting, III, the former Superintendent of the Virginia Military Institute ("VMI"), appeals the district court's award of declaratory and injunctive relief, prohibiting VMI from sponsoring a daily "supper prayer." Former VMI cadets Neil Mellen and Paul

3

Knick (the "Plaintiffs") have cross-appealed, challenging the court's award of qualified immunity to General Bunting. Because the Plaintiffs have now graduated from VMI, their claims for declaratory and injunctive relief are moot, and we vacate the district court's judgment insofar as it awarded such relief. In assessing the Plaintiffs' claim for damages, we agree with the district court that the supper prayer violates the Establishment Clause of the First Amendment, but that General Bunting is nevertheless entitled to qualified immunity. *Mellen v. Bunting*, 181 F. Supp. 2d 619 (W.D. Va. 2002) (the "Opinion").

I.

A.

VMI is a state-operated military college located in Lexington, Virginia. Since its founding in 1839, VMI has been funded by the Commonwealth of Virginia and "subject to the control of the [Virginia] General Assembly." Va. Code Ann. § 23-92. Although it offers an education in the liberal arts, VMI also strives to prepare its cadets for military service and leadership, training them to be "ready as citizen-soldiers to defend their country in time of peril. "[1] Appellant's Br. at 6.

To accomplish its mission, VMI utilizes an adversative method of training, modeled on an English educational philosophy and once characteristic of military instruction. The adversative method features physical rigor, mental stress, equality of treatment, little privacy, minute regulation of personal behavior, and inculcation of certain values. As the Supreme Court recently observed: "VMI constantly endeavors to instill physical and mental discipline in its cadets and impart to them a strong moral code." *United States v. Virginia*, 518 U.S. 515, 520 (1996).[2] In preparing its cadets for military leadership, VMI seeks

---

[1] All VMI cadets are required to participate in one of the school's four ROTC programs. Approximately 40% of VMI's graduates are commissioned as officers in the military.

[2] Historically, a VMI education was available only to men. In *United States v. Virginia*, 518 U.S. 515 (1996), the Supreme Court declared this male-only admissions policy unconstitutional.

4

to teach self-control, self-discipline, and the subordination of personal desires to the greater good.

The adversative method involves a rigorous and punishing system of indoctrination. As an able judge in the Western District of Virginia has described it: "[t]he VMI experience is predicated on the importance of creating doubt about previous beliefs and experiences in order to create a mindset conducive to the values VMI attempts to impart." *United States v. Virginia*, 766 F. Supp. 1407, 1421 (W.D. Va. 1991). As part of its program of indoctrination, VMI subjects its entering cadets (known as "rats") to a series of hazing rituals. In their first year, rats are collectively rewarded when the behavior of a single rat contributes to VMI's objectives, and they are collectively punished when the behavior of a rat detracts from those objectives.

The adversative method continues throughout a cadet's four-year career at VMI, with submission and conformity remaining central tenets of VMI's educational philosophy. As the Supreme Court noted, "[t]he school's graduates leave VMI with heightened comprehension of their capacity to deal with duress and stress, and a large sense of accomplishment for completing the hazardous course." *United States v. Virginia*, 518 U.S. at 520. Military regulations, etiquette, and drills pervade the VMI system. As the Court observed, "VMI cadets live in spartan barracks where surveillance is constant and privacy nonexistent; they wear uniforms, eat together in the mess hall, and regularly participate in drills." *Id.* at 522. In some respects, VMI is more restrictive than the regular military: its rules and regulations control how cadets spend most hours of the day. For example, cadets are authorized to leave the Post — VMI's campus in Lexington — only during specific hours on specific days.

B.

All members of VMI's Corps of Cadets (the student body) are required to pay a room and board fee. This fee covers all of a cadet's meals, which are served in the Post mess hall.[3] Although VMI serves

---

[3] Cadets (other than rats) do not technically have to eat in the mess hall, but the meals in the mess hall have been pre-paid, and a cadet's only other food options are vending machines, eating with faculty, or ordering pizza.

supper to the Corps twice each evening in the mess hall, nearly all cadets attend the first seating; only those who participate in athletics or have other special circumstances can obtain authorization to attend the second seating.

The first seating begins with the "supper roll call" (the "SRC"), initiated by a bugle call summoning the Corps into formation in front of the Barracks. After an accountability report, the colors are struck, and the Corps marches in review past the TAC Officer (the VMI faculty member in charge) to the mess hall. First classmen (cadets in their final year) are authorized to fall out of the SRC formation before the Corps marches to the mess hall. Once the formation reaches the mess hall, other cadets, except for the rats, may fall out. The rats are required to march into the mess hall and eat supper during the first seating.[4]

After the rats and other remaining cadets have entered the mess hall, the Corps is called to attention, and the Regimental Commander — the senior cadet officer — presents the Corps to the TAC Officer. Salutes are then exchanged, and the command "REST" is given. While standing at rest, a cadet may move to a limited extent, leaving his or her right foot in place. The daily announcements are made, and the Cadet Chaplain then reads the supper prayer to the assembled Corps.[5]

---

[4] Prior to the fall of 2001 (when this lawsuit was filed), all cadets desiring to eat supper at the first seating were required to participate in the SRC formation, march into the mess hall, and listen to the supper prayer. After the suit was filed, this policy changed somewhat, and members of the Corps (other than the rats) were permitted to eat supper before the SRC formation, or they could fall out of formation and enter the mess hall after the supper prayer was delivered. For the purposes of the qualified immunity issue, we must take the facts in the light most favorable to the Plaintiffs, assuming that they were required to listen to the prayer in order to eat in the mess hall. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

[5] In the past, VMI sponsored a similar meal-time prayer, but the school's administration discontinued this practice in 1990 as a result of a decision to replace family-style dining with cafeteria-style dining. In 1995, General Bunting assumed control of VMI. Seeking to bring a stronger sense of unity to the Corps, he decided to return the Corps to a traditional SRC formation and family-style dining, including the supper prayer. Although now retired, General Bunting possessed the authority during his tenure at VMI over all VMI activities, including the supper prayer.

The SRC ceremony is conducted every day except Saturday, and the Post Chaplain, Colonel James S. Park, has composed a separate supper prayer for each day. Depending on the day, the prayer begins with "Almighty God," "O God," "Father God," "Heavenly Father," or "Sovereign God." As the district court recognized, "[e]ach day's prayer is dedicated to giving thanks or asking for God's blessing." Opinion at 623. The court also observed that "a prayer may thank God for the Institute, ask for God's blessing on the Corps, or give thanks for the love and support of family and friends," and that "each day's prayer ends with the following invocation: `Now O God, we receive this food and share this meal together with thanksgiving. Amen.'" *Id.* The Corps must remain standing and silent while the supper prayer is read, but cadets are not obliged to recite the prayer, close their eyes, or bow their heads.

C.

On January 23, 2001, the Plaintiffs submitted a Permit Form to VMI's administration, requesting that cadets "be allowed to go about their business in the Mess Hall during the supper prayer (in a sense of not acknowledging that the prayer is occurring)." After their request was denied, the Plaintiffs wrote to General Bunting, asserting that the supper prayer was unconstitutional. The General promptly rejected this contention, advising them that "[t]he Constitution does not prohibit our saying grace before supper. And we shall continue to do so." General Bunting also informed the Plaintiffs that the supper prayer "is a precious link to our heritage and an admirable practice for a school of our provenience and culture," and that it would continue.

On May 9, 2001, Plaintiffs filed their complaint in the Western District of Virginia, seeking declaratory and injunctive relief, along with nominal damages, costs, and attorney's fees. They alleged that the supper prayer violated the Establishment Clause of the First Amendment; Article I, § 16 of the Virginia Constitution; and the Virginia Act for Religious Freedom, Va. Code Ann. § 57-1. After conducting discovery, the parties filed cross motions for summary judgment.

On January 24, 2002, the district court entered summary judgment in favor of the Plaintiffs, awarding them declaratory relief and enjoin-

7

ing General Bunting from sponsoring the supper prayer. Opinion at 621. In its Opinion, the court evaluated the constitutionality of the supper prayer under the test enunciated by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), concluding that the prayer violated each of *Lemon*'s prongs. Opinion at 628-37. In evaluating the Plaintiffs' request for monetary damages, the court concluded that General Bunting was entitled to qualified immunity. *Id.* at 637.

General Bunting has appealed the court's award of declaratory and injunctive relief, and the Plaintiffs have cross-appealed on the qualified immunity issue. In May of 2002, several months after the district court entered its judgment, both of the Plaintiffs graduated from VMI.

## II.

We review de novo a district court's award of summary judgment. *See Canal Ins. Co. v. Distribution Servs., Inc.*, 320 F.3d 488, 491 (4th Cir. 2003). Summary judgment is appropriate only when, viewing the facts in the light most favorable to the non-moving party, there is no genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When cross-motions for summary judgment are submitted to a district court, each motion must be considered individually, and the facts relevant to each must be viewed in the light most favorable to the non-movant. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

## III.

The first issue we must address is whether this case has become moot because the Plaintiffs no longer attend VMI. The Constitution limits this Court's jurisdiction to the adjudication of actual cases and controversies. *See* U.S. Const. art. III, § 2; *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974) (per curiam). "[A] case is moot when the issues presented are no longer `live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). The requirement that a case have an actual, ongoing controversy extends throughout the pendency of the action. *See Preiser v. Newkirk*, 422 U.S. 395, 401 (1975). When a case has become moot after the entry of the district court's judgment, an appellate court no

longer has jurisdiction to entertain the appeal. *See Mills v. Green*, 159 U.S. 651, 653 (1895).

When students challenge the constitutionality of school policies, their claims for declaratory and injunctive relief generally become moot when they graduate. *See, e.g.*, *Bd. of Sch. Comm'rs of Indianapolis v. Jacobs*, 420 U.S. 128, 129 (1975) (per curiam) ("[Once] all of the named plaintiffs in the action had graduated . . . a case or controversy no longer exists."); *Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1098 (9th Cir. 2000), *cert. denied*, 532 U.S. 905 (2001) ("It is well-settled that once a student graduates, he no longer has a live case or controversy justifying declaratory and injunctive relief against a school's action or policy."); *Stotts v. Cmty. Unit Sch. Dist. No. 1*, 230 F.3d 989, 991 (7th Cir. 2000) (holding that the "case lacks a live controversy [because the plaintiff] has graduated"). As the Plaintiffs concede, their claims for declaratory and injunctive relief are moot because they have graduated from VMI.

To avoid mootness problems, graduated students often maintain that their claims fall under an exception to the mootness doctrine where the harm is "capable of repetition, yet evading review." *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (per curiam). This exception is only applicable where: (1) the challenged action is too short in duration to be fully litigated before the case will become moot; and (2) there is a reasonable expectation that the complaining party will be subjected to the same action again. *Spencer v. Kemna*, 523 U.S. 1, 17 (1998). Graduated students do not ordinarily qualify for this exception to the mootness doctrine because, once they have graduated, they will never again be subject to the school's policies. *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 71 (2d Cir.), *cert. denied*, 534 U.S. 827 (2001) ("[T]he `capable of repetition, yet evading review' exception is not available when the issue is students' rights and the complaining students have graduated from the defendant institution."); *accord Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 798-99 (9th Cir. 1999) (en banc); *Brody v. Spang*, 957 F.2d 1108, 1113 (3d Cir. 1992).

If a claim becomes moot after the entry of a district court's final judgment and prior to the completion of appellate review, we generally vacate the judgment and remand for dismissal. *United States v.*

9

*Munsingwear, Inc.*, 340 U.S. 36, 39 (1950) (observing that, where a case has become moot on appeal, "[t]he established practice . . . is to reverse or vacate the judgment below and remand with directions to dismiss"). The *Munsingwear* rule is an equitable one, applicable only in limited circumstances, and used to ensure that a losing party's right of appellate review is not frustrated by circumstances out of that party's control. Accordingly, vacatur of the lower court's judgment is warranted only where mootness has occurred through happenstance, rather than through voluntary action of the losing party. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 71 (1997) ("Vacatur is in order when mootness occurs through happenstance — circumstances not attributable to the parties."); *U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*, 513 U.S. 18, 29 (1994) ("[M]ootness by reason of settlement does not justify vacatur of a judgment under review."); *Karcher v. May*, 484 U.S. 72, 82-83 (1987) (holding that appellate court should not vacate judgment if case has become moot due to voluntary act of the losing party). Because Plaintiffs' claims for declaratory and injunctive relief have become moot through happenstance, we vacate the district court's judgment insofar as it awarded such relief.[6]

Although the Plaintiffs' claims for declaratory and injunctive relief are moot, their damage claim continues to present a live controversy. *See Doe v. Madison Sch. Dist. No. 321*, 177 F.3d at 798 ("A student's graduation moots claims for declaratory and injunctive relief, but it does not moot claims for monetary damages."); *accord Cole*, 228 F.3d at 1099. On this issue, the district court determined that Plaintiffs had alleged a violation of their constitutional rights, but that these rights were not clearly established when General Bunting instituted the supper prayer. Accordingly, the court concluded that General Bunting "is entitled to the defense of qualified, good faith immunity." Opinion at 637. Plaintiffs have appealed this determination.

In a qualified immunity analysis, our first inquiry, as a reviewing court, is "whether plaintiff's allegations, if true, establish a constitu-

---

[6] Although we vacate the award of declaratory relief, the Plaintiffs' claim for damages requires us to answer, in assessing whether General Bunting is entitled to qualified immunity, basically the same question as the district court answered in awarding declaratory relief.

tional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002). This inquiry is made at the outset in order to promote clarity in the law and to ensure that legal standards may evolve from case to case. *Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law [was] clearly established . . . in the circumstances of the case."); *Wilson v. Layne*, 526 U.S. 603, 609 (1999) ("Deciding the constitutional question before addressing the qualified immunity question . . . promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public.").

If a constitutional violation has been alleged, our second inquiry is whether the defendant violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Figg v. Schroeder*, 312 F.3d 625, 635-36 (4th Cir. 2002) (discussing two-step process). Given this two-step inquiry, we must decide "the constitutional question before addressing the qualified immunity question," *Wilson*, 526 U.S. at 609, and it is to that inquiry that we now turn.

IV.

The Religion Clauses of the First Amendment — the Establishment Clause and the Free Exercise Clause — provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The Fourteenth Amendment incorporates the First Amendment against the states and their political subdivisions. *See Everson v. Bd. of Educ.*, 330 U.S. 1, 8 (1947) (applying Establishment Clause to states); *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (applying Free Exercise Clause to states). In the words of the Supreme Court, "[t]he First Amendment's Religion Clauses mean that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State." *Lee v. Weisman*, 505 U.S. 577, 589 (1992).

In construing the Establishment Clause, the Court has made clear that a state is prohibited from sponsoring prayer in its elementary and secondary schools. That said, the Court has never directly addressed whether the Establishment Clause forbids state-sponsored prayer at a public college or university. In order to provide some background for

11

our evaluation of the constitutionality of VMI's supper prayer, we briefly review the relevant school prayer jurisprudence.

A.

In *Engel v. Vitale*, 370 U.S. 421 (1962), the Court addressed a school board policy in New York that required daily recitation, in the state's elementary and secondary schools, of a prayer selected by the State Board of Regents. The prayer read: "Almighty God, we acknowledge our dependence upon Thee, and we beg Thy blessings upon us, our parents, our teachers and our Country." *Id.* at 422. The Court struck down the state-sponsored prayer, emphasizing the inherently religious nature of prayer. *Id.* at 424-25. According to the Court:

> the constitutional prohibition against laws respecting an establishment of religion must at least mean that in this country it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by government.

*Id.* at 425. Further, "[n]either the fact that the prayer may be denominationally neutral nor the fact that its observance on the part of the students is voluntary can serve to free it from the limitations of the Establishment Clause." *Id.* at 430.

The Court reaffirmed these principles the very next year in *Abington School District v. Schempp*, 374 U.S. 203 (1963). There, the Court struck down the practices of various elementary and secondary schools of beginning each school day with readings from the Bible or recitation of the Lord's Prayer. In holding such practices unconstitutional, the Court emphasized that the Establishment Clause prohibits a school from sponsoring any type of prayer, even a nondenominational one, since a state may not "pass laws which aid one religion, aid all religions, or prefer one religion over another." *Id.* at 216 (internal quotation marks omitted). Significantly, the schools could not cure the Establishment Clause defect by simply allowing students to leave the room while the Bible verses or the Prayer were read. *Id.* at 224-25. The Court also rejected the idea that enforcement of Estab-

12

lishment Clause principles infringed on the free exercise rights of those students who wished to pray. *Id.* at 225-26.

Twenty-two years later, in *Wallace v. Jaffree*, 472 U.S. 38 (1985), the Court invalidated an Alabama statute mandating a moment of silence in the state's public schools "for meditation or voluntary prayer." *Id.* at 40, 61. The statute altered an earlier version of a similar law, which had established a moment of silence for the purpose of "meditation." In deciding *Wallace*, the Court applied the test first enunciated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971).[7] *Wallace*, 472 U.S. at 55-56. In order to pass muster under the *Lemon* test, a statute must satisfy three criteria: (1) it must have a secular purpose; (2) its principal or primary effect must be one that neither advances nor inhibits religion; and (3) it must not foster an excessive government entanglement with religion. *Lemon*, 403 U.S. at 612-13. Because the Court in *Wallace* could discern no secular purpose for adding the word "prayer" to the challenged statute, it concluded that the statute failed *Lemon*'s first prong. *Wallace*, 472 U.S. at 56-61.

More recently, in *Lee v. Weisman*, 505 U.S. 577 (1992), the Court invalidated a school's practice of inviting a member of the clergy to deliver a nonsectarian prayer at a commencement ceremony. *Id.* at 599. The dominant factor guiding the Court's decision in *Lee* was the coercive nature of the religious activity. In particular, the Court emphasized that, "at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise." *Id.* at 587. In discussing whether the students had a choice to attend the commencement, the Court observed that, "attendance and participation in a state-sponsored religious activity are in a fair and real sense obligatory, though the school district does not require attendance as a condition for receipt of the diploma." *Id.* at 586. In those circumstances, the Court found that the commencement prayer improperly coerced religious worship.

---

[7] In *Lemon*, the Supreme Court held that the practices of certain states in providing funding to religious schools violated the Establishment Clause. 403 U.S. at 606. In holding these practices unconstitutional, the Court developed an often-criticized, tripartite framework for evaluating Establishment Clause challenges. *Id.* at 612-13.

In its most recent school-prayer decision, *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000), the Court struck down a policy that authorized a school's student body to vote on whether an invocation would be delivered at its football games. In *Santa Fe*, the Court considered two primary issues. First, it assessed whether the invocation should be considered public, rather than private, speech. *Id.* at 302-03, 305-10. On this issue, the Court concluded that, even though the students made the decision about whether to pray, the school had created the mechanism by which the decision was made, and the prayer was to be delivered "over the school's public address system, by a speaker representing the student body, under the supervision of school faculty, and pursuant to a school policy that explicitly and implicitly encourages public prayer." *Id.* at 310. For these reasons, the Court decided that the school effectively sponsored the student-led prayer. *Id.*

The second issue considered in *Santa Fe*, and an issue of substantial significance here, involved whether the pregame prayer was unduly coercive. On this point, the Court noted that certain students, including cheerleaders and football players, were required to attend the football games. *Id.* at 311. For other students, the "immense social pressure" created by surrounding circumstances compelled their attendance. *Id.* at 311-12. The Court concluded that, "[e]ven if we regard every high school student's decision to attend a home football game as purely voluntary, we are nevertheless persuaded that the delivery of a pregame prayer has the improper effect of coercing those present in an act of religious worship." *Id.* at 312. On this basis, the Court determined that the pregame prayer had an unduly coercive effect, and that the school had accordingly violated the Establishment Clause. *Id.* at 313, 317.

As these decisions reflect, the Court has been unwavering in its position that the Establishment Clause prohibits public schools from sponsoring an official prayer. The Court has not, however, directly addressed whether, or to what extent, a state may sponsor prayer at an institution of higher education. Because VMI is such an institution, we briefly consider how our sister circuits have dealt with the issue of state-sponsored prayer in public colleges and universities.

14

B.

In a situation closely analogous to that presented here, the Court of Appeals for the District of Columbia, in *Anderson v. Laird*, 466 F.2d 283 (D.C. Cir. 1972), addressed a federal regulation that required all cadets and midshipmen at the military academies to attend "Protestant, Catholic or Jewish chapel services on Sundays." *Id.* at 284. In *Anderson*, the court ruled that this chapel attendance requirement violated the Establishment Clause. *Id.* at 283-84. In its lead opinion, the court concluded that the "government may not require an individual to engage in religious practices or be present at religious exercises." *Id.* at 291. Significantly, the court held that the regulation violated the Constitution even though: (1) attendance at the military academies was voluntary; and (2) cadets and midshipmen could be excused from the chapel attendance requirement. *Id.* at 293.

More recently, in *Tanford v. Brand*, 104 F.3d 982 (7th Cir. 1997), the Seventh Circuit considered whether a state university could include a religious invocation as part of its graduation ceremony. In upholding the practice, the court suggested that the invocation was not coercive, in that students were not required to attend and attendees did not feel compelled to participate in the invocation — in fact, students and their guests frequently came in and out (or remained seated) while the invocation was delivered. *Id.* at 985-86. The court characterized the invocation as "simply a tolerable acknowledgment of beliefs widely held among the people of this country." *Id.* at 986 (internal quotation marks omitted).

In *Chaudhuri v. Tennessee*, 130 F.3d 232 (6th Cir. 1997), the Sixth Circuit also declined to enjoin a state university's practice of including prayer in its graduation ceremony. Evaluating the practice under the *Lemon* test, the court first held that such prayers had a secular purpose in that they "solemniz[ed] public occasions, express[ed] confidence in the future, and encourag[ed] the recognition of what is worthy of appreciation in society." *Id.* at 236 (internal quotation marks omitted and alterations in original). Moving to *Lemon*'s second prong, the court decided that "an audience of college-educated adults could [not] be influenced unduly by prayers of the sort in question here." *Id.* at 237. On *Lemon*'s final criterion, the court concluded: "[i]t does not seem to us that the practice of including nonsectarian prayers

15

or moments of silence at [school] events creates any church-state entanglement at all." *Id.* at 238.

V.

General Bunting contends that we need not reach the "clearly established" prong of the qualified immunity analysis because the Establishment Clause does not prohibit VMI's supper prayer. In particular, he suggests that we should apply the standard employed by the Supreme Court in *Marsh v. Chambers*, 463 U.S. 783 (1983), where the Court — based on the unique history of the practice — upheld Nebraska's practice of opening its legislative sessions with a prayer. In support of his position, the General insists that prayer during military ceremonies and before meals is part of the fabric of our society, and that the drafters of the First Amendment did not intend to prohibit prayer before meals at a military school.[8] Independently, General Bunting maintains that, even if the traditional Establishment Clause analysis applies, the supper prayer should be upheld because the prohibition on state-sponsored prayer does not apply to a military college.

The Plaintiffs, by contrast, contend that the supper prayer is no different than the government-sponsored prayers struck down by the Supreme Court in *Engel*, *Schempp*, *Lee*, and *Santa Fe*. They emphasize that the supper prayer is composed by a state official (the VMI Post Chaplain) and that it is delivered on a daily basis at mealtime, when the Corps is assembled as a "family." Furthermore, the prayer is delivered as part of an official VMI function, entirely controlled by the school. The supper prayer, according to the Plaintiffs, bears the strong imprimatur of the state: VMI's cadets are marched in uniform and in formation to the mess hall before the state-composed prayer is delivered.

---

[8] General Bunting also suggests that VMI has a First Amendment interest that must be weighed in the Establishment Clause analysis. Contrary to this contention, VMI has no First Amendment interests that it can wield against the constitutional rights of its cadets. *See Hopwood v. Texas*, 78 F.3d 932, 943, n.25 (5th Cir. 1996) ("Saying that a [state] university has a First Amendment interest in this context is somewhat troubling. . . . The First Amendment generally protects citizens from the actions of government, not government from its citizens.").

16

A.

We must begin our resolution of these competing positions by identifying the standard that should guide our analysis of the constitutionality of VMI's supper prayer. General Bunting first suggests that we should view the prayer as a uniquely historical practice, in an approach similar to that employed by the Supreme Court in *Marsh*. In *Marsh*, though, the Court was specifically influenced by the fact that, in September of 1789, members of the first Congress voted to submit the First Amendment to the states in the same week that they voted "to appoint and to pay a Chaplain for each House" of Congress. 463 U.S. at 790. In upholding the Nebraska practice, Chief Justice Burger reasoned: "[t]his unique history leads us to accept the interpretation of the First Amendment draftsmen who saw no real threat to the Establishment Clause arising from a practice of prayer similar to that now challenged." *Id.* at 791.

The Supreme Court has since emphasized that *Marsh* is applicable only in narrow circumstances. In *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573 (1989), the Court recognized that the *Marsh* decision "relied specifically on the fact that Congress authorized legislative prayer at the same time that it produced the Bill of Rights." *Id.* at 602. The Court expressly declined to interpret *Marsh* to mean that "all accepted practices 200 years old and their equivalents are constitutional today." *Id.* at 603. Likewise, in *North Carolina Civil Liberties Union Legal Foundation v. Constangy*, 947 F.2d 1145 (4th Cir. 1991), we emphasized, in invalidating a judge's practice of opening court with a prayer, that *Marsh* was "predicated on the particular historical circumstances presented in that case." 947 F.2d at 1148.

Put simply, the supper prayer does not share *Marsh*'s "unique history." In fact, public universities and military colleges, such as VMI, did not exist when the Bill of Rights was adopted. Opinion at 625. We are therefore unable to apply *Marsh*'s reasoning to the evaluation of the constitutionality of the supper prayer. *See Edwards v. Aguillard*, 482 U.S. 578, 583 n.4 (1987) (emphasizing that the *Marsh* analysis "is not useful in determining the proper roles of church and state in public schools, since free public education was virtually nonexistent at the time the Constitution was adopted"); *see also Coles v. Cleve-*

17

*land Bd. of Educ.*, 171 F.3d 369, 381 (6th Cir. 1999) (noting that "*Marsh* is one-of-a-kind" and declining to apply *Marsh*'s reasoning in assessing constitutionality of prayer at school board meetings).

B.

In rejecting the *Marsh* analysis, we are left to choose among the three traditional tests that the Supreme Court has used to evaluate Establishment Clause challenges. The test most often employed is that enunciated by the Court in *Lemon*. 403 U.S. at 612-13. A second test, known as the "endorsement test," was first articulated by Justice O'Connor in her concurrence in *Lynch v. Donnelly*, 465 U.S. 668 (1984), and later adopted by a majority of the Court in *County of Allegheny*, 492 U.S. at 592-94. Under the endorsement test, the government may not engage in a practice that suggests to the reasonable, informed observer that it is endorsing religion. *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring). Finally, in *Lee*, the Court formulated its "coercion test," under which "government may not coerce anyone to support or participate in religion or its exercise." 505 U.S. at 587.

While the *Lemon* test dominates Establishment Clause jurisprudence, coercion has emerged as a prevailing consideration in the school prayer context. Because the Court has applied a variety of tests (in various combinations) in school prayer cases, federal appellate courts have also followed an inconsistent approach. *See, e.g.*, *Adler v. Duval County Sch. Bd.*, 206 F.3d 1070, 1075 (11th Cir.) (en banc), *vacated by* 531 U.S. 801 (2000), *opinion reinstated on remand by* 250 F.3d 1330 (11th Cir.) (en banc), *cert. denied*, 534 U.S. 1065 (2001) (separating coercion test from *Lemon* test and applying both); *Coles*, 171 F.3d at 383 (same); *Chaudhuri*, 130 F.3d at 236-38 (same); *Tanford*, 104 F.3d at 985-86 (same); *ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1478-83 (3d Cir. 1996) (en banc) (same); *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 279-80 (5th Cir. 1996) (applying all three tests).

During the past decade, we have emphasized that the *Lemon* test guides our analysis of Establishment Clause challenges. *See Koenick v. Felton*, 190 F.3d 259, 264 (4th Cir. 1999) ("`[U]ntil the Supreme Court overrules *Lemon* and provides an alternative analytical framework, this Court must rely on *Lemon* in evaluating the constitutional-

18

ity of legislation under the Establishment Clause.'" (quoting *Barghout v. Bureau of Kosher Meat & Food Control*, 66 F.3d 1337, 1343 n.11 (4th Cir. 1995))); *accord Brown v. Gilmore*, 258 F.3d 265, 275 (4th Cir.), *cert. denied*, 534 U.S. 996 (2001). In the context of school prayer, though, we must give special consideration, under the principles discussed in *Lee* and *Santa Fe*, to whether a state has coerced religious worship. In the analysis that follows, we therefore assess the supper prayer against the principles announced in *Lee* and *Santa Fe*, and we then apply the *Lemon* criteria, treating the endorsement test as a refinement of *Lemon*'s second prong. *See Adland v. Russ*, 307 F.3d 471, 479 (6th Cir. 2002), *petition for cert. filed*, 71 U.S.L.W. 3568 (U.S. Feb. 20, 2003) (No. 02-1241) (treating "the endorsement test as a refinement of the second *Lemon* prong").

## VI.

### A.

Under the Supreme Court's decisions in *Lee* and *Santa Fe*, school officials may not, consistent with the Establishment Clause, compel students to participate in a religious activity. As the Court emphasized in *Lee*, "our precedents do not permit school officials to assist in composing prayers as an incident to a formal exercise for their students." 505 U.S. at 590. The efforts of school officials "to monitor prayer will be perceived by the students as inducing a participation they might otherwise reject." *Id.* In defending the constitutionality of the supper prayer, General Bunting gives two reasons why the prayer should be upheld. First, he insists that VMI's cadets are mature adults, who will not feel coerced to participate in the supper prayer. Alternatively, he suggests that the members of the Corps (other than the rats) may avoid the prayer by falling out of the SRC formation before the Corps enters the mess hall.

It is undoubtedly true that grade school children are particularly "susceptible to pressure from their peers towards conformity." *Id.* at 593. Recognizing a difference between such children and college students, certain of our sister circuits have approved the decisions of public universities to offer an invocation at graduation ceremonies. For example, in *Tanford*, the Seventh Circuit found that an invocation at a university commencement was not coercive. 104 F.3d at 985-86.

19

Similarly, in *Chaudhuri*, the Sixth Circuit allowed a state university to include a prayer at its graduation ceremonies, concluding that "here there was no coercion — real or otherwise — to participate in the nonsectarian prayers," 130 F.3d at 239 (internal quotation marks omitted), because "an audience of college-educated adults could [not] be influenced unduly by prayers of the sort in question here." *Id.* at 237.

Although VMI's cadets are not children, in VMI's educational system they are uniquely susceptible to coercion. VMI's adversative method of education emphasizes the detailed regulation of conduct and the indoctrination of a strict moral code. Entering students are exposed to the "rat line," in which upperclassmen torment and berate new students, bonding "new cadets to their fellow sufferers and, when they have completed the 7-month experience, to their former tormentors." *United States v. Virginia*, 518 U.S. at 522. At VMI, even upperclassmen must submit to mandatory and ritualized activities, as obedience and conformity remain central tenets of the school's educational philosophy. In this atmosphere, General Bunting reinstituted the supper prayer in 1995 to build solidarity and bring the Corps together as a family. In this context, VMI's cadets are plainly coerced into participating in a religious exercise. Because of VMI's coercive atmosphere, the Establishment Clause precludes school officials from sponsoring an official prayer, even for mature adults.

The technical "voluntariness" of the supper prayer does not save it from its constitutional infirmities. At all relevant times, VMI's upperclass cadets could avoid the mess hall in order to shield themselves from the prayer. Nevertheless, the communal dining experience, like other official activities, is undoubtedly experienced as obligatory.[9] Through the hazing rituals that dominate a cadet's first year, members of the Corps are trained to participate in VMI's official activities. With this atmosphere as a background, VMI cannot avoid Establishment Clause problems by simply asserting that a cadet's attendance at supper and his or her participation in the supper prayer are "volun-

---

[9] Even if dining in the mess hall was truly voluntary, the First Amendment prohibits General Bunting from requiring religious objectors to alienate themselves from the VMI community in order to avoid a religious practice. *Lee*, 505 U.S. at 596.

20

tary." In the words of the Supreme Court, "`the government may no more use social pressure to enforce orthodoxy than it may use more direct means.'" *Santa Fe*, 530 U.S. at 312 (quoting *Lee*, 505 U.S. at 594). Put simply, VMI's supper prayer exacts an unconstitutional toll on the consciences of religious objectors. While the First Amendment does not in any way prohibit VMI's cadets from praying before, during, or after supper, the Establishment Clause prohibits VMI from sponsoring such a religious activity.[10]

### B.

We are compelled to reach the same conclusion when the supper prayer is measured against the three-part *Lemon* test. Under *Lemon*, a prayer must have a secular purpose; the primary effect of the prayer must be one that neither advances nor inhibits religion; and finally, the prayer must not foster an excessive government entanglement with religion. 403 U.S. at 612-13. If we accept General Bunting's asserted purposes, the supper prayer may satisfy *Lemon*'s "secular purpose" prong. Nevertheless, in sponsoring an official prayer, VMI has plainly violated *Lemon*'s second and third prongs.

### 1.

The first prong of *Lemon* contemplates an inquiry into the subjective intentions of the government. "In applying the purpose test, it is appropriate to ask `whether government's actual purpose is to endorse or disapprove of religion.'" *Wallace*, 472 U.S. at 56 (quoting *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring)). The secular purpose requirement presents "a fairly low hurdle" for the state, *Brown*, 258 F.3d at 276 (internal quotation marks omitted), and a state-sponsored practice violates this prong of *Lemon* only "if it is *entirely* motivated by a purpose to advance religion." *Wallace*, 472 U.S. at 56 (emphasis

---

[10] If VMI's administration desires to teach cadets about religion, it is entitled to offer such classes in its curriculum. *See, e.g.*, *Epperson v. Arkansas*, 393 U.S. 97, 106 (1968) ("[S]tudy of religions and of the Bible from a literary and historic viewpoint, presented objectively as part of a secular program of education, need not collide with the First Amendment's prohibition."); *Altman*, 245 F.3d at 76 ("[T]he Establishment Clause does not prohibit schools from teaching about religion.").

added). Nevertheless, a state may disingenuously profess a secular purpose for what is, in fact, a religious practice. While the state's characterization of its purpose is entitled to deference, it is our obligation to distinguish "a sham secular purpose from a sincere one." *Santa Fe*, 530 U.S. at 308 (internal quotation marks omitted).

General Bunting has proffered several purposes (purportedly secular) for the supper prayer. First, he maintains that the prayer serves "an academic function by aiding VMI's mission of developing cadets into military and civilian leaders." Appellant's Br. at 47. Toward this end, the supper prayer supposedly promotes religious tolerance, educates cadets about religion, and gets "students to engage with their own beliefs." *Id.* at 12. According to General Bunting, the supper prayer encourages "cadets to reflect on and develop their own spiritual dimension." *Id.* (internal quotation marks omitted). The prayer, in the General's words, also serves an expressive and institutional function by "providing an occasion for American's tradition of expressing thanksgiving and requesting divine guidance." *Id.* at 48. Finally, General Bunting contends that the prayer "accommodate[s] the spiritual needs and free exercise rights of cadets, whose opportunities to meet those needs and exercise those rights are limited by the demands of barracks life and the highly structured nature of the VMI program." *Id.* at 50.

In assessing General Bunting's asserted purposes for the supper prayer, we are concerned that he seeks to obscure the difference between educating VMI's cadets about religion, on the one hand, and forcing them to practice it, on the other. When a state-sponsored activity has an overtly religious character, courts have consistently rejected efforts to assert a secular purpose for that activity. Indeed, we have emphasized that "an act so intrinsically religious as prayer cannot meet, or at least would have difficulty meeting, the secular purpose prong of the *Lemon* test." *Constangy*, 947 F.2d at 1150. And we have also recognized the obvious, that recitation of a prayer "is undeniably religious and has, by its nature, both a religious purpose and effect." *Hall v. Bradshaw*, 630 F.2d 1018, 1020 (4th Cir. 1980).

In an analogous situation, the Court of Appeals for the District of Columbia rejected the government's contention that a federal regulation requiring chapel attendance had a secular purpose. *See Anderson*,

22

466 F.2d at 285, 290. The federal government maintained (as VMI does here) that chapel services accommodated the free exercise rights of cadets and midshipmen, as well as sensitizing them to the religious beliefs of the soldiers and sailors they would someday lead. Rejecting the contention that these purposes justified the chapel attendance requirement, the court found that the regulation lacked a secular purpose. *Id.*; *see also Edwards*, 482 U.S. at 581, 586 (concluding that statute violated *Lemon*'s secular purpose prong by prohibiting "the teaching of the theory of evolution in public schools unless accompanied by instruction in `creation science'"); *Hall*, 630 F.3d at 1020-21 (rejecting government's contention that motorist's prayer printed on state map had a secular purpose).

Similarly, in *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam), the Supreme Court found no secular purpose for a statute that required the Ten Commandments be posted on the walls of all of a state's public schools. In that situation, the legislature of Kentucky had required that each copy of the Ten Commandments be printed with the words: "[t]he secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States." *Id.* at 41 (citation omitted). The Supreme Court rejected this characterization, concluding that:

> [t]he pre-eminent purpose for posting the Ten Command-
> ments on schoolroom walls is plainly religious in nature.
> The Ten Commandments are undeniably a sacred text in the
> Jewish and Christian faiths, and no legislative recitation of
> a supposed secular purpose can blind us to that fact.

*Id.* (footnote omitted). In invalidating the statute, the Court refused to ignore the religious purpose of this overtly religious text.

We are inclined to agree that the purpose of an official school prayer "is plainly religious in nature." **11** *Id.* In evaluating the constitu-

---

**11** Indeed, the district court found that the supper prayer lacked a secular purpose, stating that "[t]he only logical conclusion that can be drawn from [the asserted purposes] is that part of the Institute's educational mission, in the eyes of General Bunting, is religious indoctrination." Opinion at 629.

23

tionality of the supper prayer, however, we will accord General Bunting the benefit of all doubt and credit his explanation of the prayer's purposes. Assuming the supper prayer to be motivated by secular goals, we turn to the second and third prongs of *Lemon*.

2.

Regardless of the purposes motivating it, the supper prayer fails *Lemon*'s second prong. This "primary effect" prong must be assessed objectively, in order to measure whether the principal effect of government action "is to suggest government preference for a particular religious view or for religion in general." *Barghout*, 66 F.3d at 1345. Put differently, "[t]he effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval [of religion]." *Wallace*, 472 U.S. at 56 n.42 (internal quotation marks omitted).

The supper prayer has the primary effect of promoting religion, in that it sends the unequivocal message that VMI, as an institution, endorses the religious expressions embodied in the prayer.[12] *See Engel*, 370 U.S. at 430 ("There can be no doubt that New York's state prayer program officially establishes the religious beliefs embodied in the . . . prayer."). The supper prayer is "delivered to a large audience assembled as part of a regularly scheduled, school-sponsored function conducted on school property." *Santa Fe*, 530 U.S. at 307. In this context, "an objective observer, acquainted with the [supper prayer] would perceive it as a state endorsement of prayer in public schools." *Id.* at 308 (internal quotation marks omitted).

---

[12] General Bunting asserts that the supper prayer is designed to be both inclusive and nondenominational. Nevertheless, the prayer takes a particular view of religion, one that is monotheistic, patriarchal, and indebted to Judeo-Christian values and conventions of worship. In any event, the Establishment Clause prohibits a state from sponsoring any type of prayer, even a nondenominational one. *Lee*, 505 U.S. at 610 (Souter, J., concurring) ("[T]he Establishment Clause forbids state-sponsored prayers in public school settings no matter how nondenominational the prayers may be."). A state may no more establish a civic religion than an overtly parochial one. *Id.* at 590; *see also Engel*, 370 U.S. at 430 (holding that prayer violated Establishment Clause even though it was "denominationally neutral").

24

As the Court has observed, "[s]uch an endorsement is not consistent with the established principle that the government must pursue a course of complete neutrality toward religion." *Wallace*, 472 U.S. at 60. Even though VMI intended the supper prayer to be both inclusive and nondenominational, the Establishment Clause prohibits a state from promoting religion by authoring and promoting prayer for its citizens. In the words of the Court, "[t]he First Amendment was added to the Constitution to stand as a guarantee that neither the power nor the prestige of the Federal Government would be used to control, support or influence the kinds of prayer the American people can say." *Engel*, 370 U.S. at 429. In establishing its supper prayer, VMI has done precisely what the First Amendment forbids.

In numerous other cases, courts have struck down similar practices under *Lemon*'s "primary effect" prong. *See, e.g.*, *Freiler v. Tangipahoa Parish Bd. of Educ.*, 185 F.3d 337, 346-47 (5th Cir. 1999) (striking down policy requiring teachers to read disclaimer before teaching theory of evolution); *Coles*, 171 F.3d at 384-85 (same for practice of school board to open meetings with prayer); *Ingebretsen*, 88 F.3d at 279 (same for statute authorizing students to initiate prayer at school functions); *Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d at 1487 (same for policy authorizing student vote on whether to incorporate prayer in graduation ceremony); *Doe v. Duncanville Indep. Sch. Dist.*, 70 F.3d 402, 406 (5th Cir. 1995) (same for participation of basketball coach in prayer after games).

With these decisions as a jurisprudential background, we are constrained to conclude that the supper prayer conflicts with *Lemon*'s second prong. Although we recognize and respect a cadet's individual desire to say grace before supper, the Establishment Clause prohibits VMI from sponsoring this religious practice. *See ACLU, Greater Pittsburgh Chapter v. County of Allegheny*, 842 F.2d 655, 662 (3d Cir. 1988), *aff'd in part and rev'd in part by* 492 U.S. 573 (1989) ("While we do not doubt that some persons find [the government's support of religion] laudable, it . . . violates the Establishment Clause of the First Amendment.").

3.

While *Lemon*'s second prong could dispose of the constitutional issue, VMI's sponsorship of the supper prayer also brings the school

25

into conflict with *Lemon*'s third prong, excessively entangling it with religious activity. *Lemon*, 403 U.S. at 615. As the Eleventh Circuit recently stated, "[t]he ability to regulate the content of speech is a hallmark of state involvement." *Adler*, 250 F.3d at 1337; *see also Coles*, 171 F.3d at 385 (finding excessive entanglement where "[t]he school board decided to include prayer in its public meetings, chose which member from the local religious community would give those prayers, and . . . had the school board president himself compose and deliver prayers to those in the audience"). Here, VMI has composed, mandated, and monitored a daily prayer for its cadets. In this way, VMI has taken a position on what constitutes appropriate religious worship — an entanglement with religious activity that is forbidden by the Establishment Clause.

## C.

Our decision today does not reflect any "hostility toward religion or toward prayer."[13] *Engel*, 370 U.S. at 434. As we have recognized, our "`Nation's history has not been one of entirely sanitized separation between Church and State,' and it `has never been thought either possible or desirable to enforce a regime of total separation.'" *Brown*, 258 F.3d at 274 (quoting *Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 760 (1973)); *accord Lynch*, 465 U.S. at 673. Indeed, the Establishment Clause protects religious expression from governmental interference. *Brown*, 258 F.3d at 273-74. "The Establishment Clause thus stands as an expression of principle on the part of the Founders of our Constitution that religion is too personal, too sacred, too holy, to permit its `unhallowed perversion'" by government. *Engel*, 370 U.S. at 431-32 (quoting Memorial and Remonstrance against Religious Assessments, II Writings of James Madison 183, 187).

While General Bunting may have instituted the supper prayer with the best of intentions, in so doing he has placed VMI at odds with the Establishment Clause. The Founding Fathers "led the fight for adop-

---

[13] We also note that we are not called upon to address whether, or to what extent, the military may incorporate religious practices into its ceremonies. The Virginia General Assembly, not the Department of Defense, controls VMI.

tion of our Constitution and also for our Bill of Rights with the very guarantees of religious freedom that forbid [this] sort of governmental activity." *Engel*, 370 U.S. at 435. Indeed, "one of the greatest dangers to the freedom of the individual to worship in his own way [lies] in the Government's placing its official stamp of approval upon one particular kind of prayer." *Id.* at 429.

## VII.

Having decided that VMI's supper prayer conflicts with First Amendment principles, we turn to whether General Bunting is nevertheless entitled to qualified immunity. As a state official, General Bunting is immune from damages unless he violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. In this regard, a principle of constitutional law may be "clearly established" even though the precise factual situation has never been presented to a court. Accordingly, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741.

Although the Establishment Clause plainly forbids public schools from sponsoring an official prayer for young children, the Supreme Court has never addressed the constitutionality of state-sponsored prayer in any university setting, much less in a military college. Indeed, some of our sister circuits have approved prayer at certain university functions. *See supra* Part IV.B. In addition, the Court has not had the occasion to consider whether, or to what extent, the military may incorporate religious practices in its ceremonies. *See Batten v. Gomez*, ___ F.3d ___, 2003 WL 403336, at *6 (4th Cir. Feb. 24, 2003) ("[W]e have been unable to find any authoritative cases considering analogous circumstances."). In these circumstances, General Bunting could reasonably have believed that the supper prayer was constitutional, and we must affirm the district court's decision to award him qualified immunity.

## VIII.

For the foregoing reasons, we vacate the district court's judgment awarding Plaintiffs declaratory and injunctive relief. We affirm the

27

court's decision that the Plaintiffs have alleged a violation of their rights under the Establishment Clause, but that General Bunting is nevertheless entitled to qualified immunity.

*AFFIRMED IN PART AND VACATED IN PART*

28