**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

B. DAVID RIDPATH,
                    *Plaintiff-Appellee,*

v.

BOARD OF GOVERNORS MARSHALL
UNIVERSITY; DAN ANGEL; F. LAYTON
COTTRILL; K. EDWARD GROSE,
                    *Defendants-Appellants,*

            and

BOB PRUETT; RICHARD HILLIARD,
                    *Defendants.*

No. 04-1314

B. DAVID RIDPATH,
                    *Plaintiff-Appellee,*

v.

BOB PRUETT,
            *Defendant-Appellant,*

            and

BOARD OF GOVERNORS MARSHALL
UNIVERSITY; DAN ANGEL; F. LAYTON
COTTRILL; K. EDWARD GROSE;
RICHARD HILLIARD,
                    *Defendants.*

No. 04-1328

Appeals from the United States District Court
for the Southern District of West Virginia, at Huntington.
Robert J. Staker, Senior District Judge.
(CA-03-2037)

Argued: February 3, 2005

Decided: May 11, 2006

Before WIDENER and KING, Circuit Judges, and
Henry F. FLOYD, United States District Judge for the
District of South Carolina, sitting by designation.

_____

Dismissed in part and affirmed in part by published opinion. Judge
King wrote the opinion, in which Judge Floyd joined. Judge Widener
wrote a separate opinion concurring in part and dissenting in part.

_____

**COUNSEL**

**ARGUED:** Charles R. Bailey, BAILEY & WYANT, P.L.L.C.,
Charleston, West Virginia, for Appellants. Jason Eskwith Huber,
FORMAN & HUBER, L.C., Charleston, West Virginia, for Appellee.
**ON BRIEF:** Cheryl L. Connelly, Edward M. Kowal, Jr., CAMP-
BELL, WOOD, BAGLEY, EMERSON, MCNEER & HERNDON,
Huntington, West Virginia, for Appellant Bob Pruett.

_____

**OPINION**

KING, Circuit Judge:

David Ridpath initiated this lawsuit in the Southern District of
West Virginia in August 2003 against the Board of Governors of
Marshall University; three of the University's administrators, Dan
Angel, Layton Cottrill, and Edward Grose (collectively, the "Admin-
istrators"); then-Head Football Coach Bob Pruett; and Richard Hil-
liard, who had been retained by the University as its Special Legal
Counsel.[1] Ridpath, a Marshall University employee and former athlet-

_____

[1] When this lawsuit was filed, Angel was the University's President,
Cottrill its Vice President for Executive Affairs and General Counsel,
and Grose its Senior Vice President for Operations. Two notices of
appeal have been filed: one by the Board and the Administrators; and a
second by Coach Pruett. Hilliard is not a party to these appeals.

ics official, alleged multiple state and federal causes of action against the Defendants in their individual and official capacities, centered on their conduct with respect to an investigation of the University's violations of National Collegiate Athletic Association ("NCAA") rules. These causes of action included claims under 42 U.S.C. § 1983 (collectively, the "§ 1983 claims") that Ridpath's Fourteenth Amendment right to due process was violated by the Board, the Administrators, and Hilliard, and that his First Amendment right to free speech was infringed in one way by the Board and the Administrators, and in a second way by these Defendants and Coach Pruett. Asserting various grounds, the Board, the Administrators, and Coach Pruett promptly sought dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The district court denied these motions in part, rejecting, *inter alia*, the Board's and the Administrators' assertions of qualified immunity on the three § 1983 claims. *See Ridpath v. Bd. of Governors*, No. CA-03-2037 (S.D. W. Va. Feb. 17, 2004) (the "Opinion").

By these appeals, the Board, the Administrators, and Coach Pruett seek review of the district court's denial of qualified immunity, relying on the collateral order doctrine for appellate jurisdiction. As explained below, we dismiss Coach Pruett's appeal for lack of standing, and we conclude that the appeal of the Board and the Administrators is properly before us. On the merits of qualified immunity, we affirm the decision of the district court in rejecting this defense at the Rule 12(b)(6) stage of these proceedings.[2]

## I.

### A.

The facts relevant to these appeals are largely drawn from the operative complaint in these proceedings, *i.e.*, Ridpath's "Amended Com-

---

[2]In ruling today, we acknowledge that the Appellants are not precluded from reasserting claims of qualified immunity at the summary judgment stage of the underlying proceedings, or from appealing, under the collateral order doctrine, any adverse district court rulings on such claims. *See Behrens v. Pelletier*, 516 U.S. 299, 306-07 (1996) (recognizing that defendant may raise qualified immunity at successive stages of litigation, and appeal denial of such defense more than once).

plaint" of December 19, 2003, superseding his "Initial Complaint" of August 4, 2003.[3] According to the Amended Complaint, Ridpath's chosen career is in intercollegiate athletics administration, particularly in the area of overseeing compliance with NCAA rules. *See* Amended Complaint at ¶¶ 14-15, 52. Ridpath was hired by Marshall University in November 1997 as an Assistant Athletic Director in charge of the Compliance Office, or "Compliance Director." *Id.* at ¶ 16. At some point, Ridpath was also assigned teaching responsibilities as an Adjunct Professor in the Exercise and Sports Science Department. *Id.* at ¶ 46.

On approximately July 2, 1999, it was reported to Ridpath that several Marshall football players were involved in academic fraud, having received an advance copy of a physical education test. *See* Amended Complaint at ¶ 19. Ridpath informed the NCAA of this allegation, prompting an investigation conducted by the NCAA and the University. *Id.* at ¶ 20. During this investigation, the University discovered and informed the NCAA of further infractions involving certain "props," *i.e.*, students seeking academic eligibility to join sports teams. *Id.* at ¶¶ 20-21. Members of the coaching staff had improperly alluded to employment opportunities in recruiting these props, and assisted them in securing jobs — at above-market wages

---

[3]We are obliged, in our review of the district court's qualified immunity ruling, to accept as true the facts alleged in the Amended Complaint and to view them in the light most favorable to Ridpath. *See Jenkins v. Medford*, 119 F.3d 1156, 1159 (4th Cir. 1997) (en banc). In addition to the Amended Complaint, several exhibits are before us. By Order of October 22, 2004, we permitted the Appellants to attach these exhibits to their reply brief. We further allowed Ridpath to object to the use of any fact shown in the exhibits that was not otherwise alleged in the Amended Complaint. In the final analysis, the exhibits have been of limited utility to our review, because the Appellants rely on them largely in an effort to contradict and disprove the Amended Complaint's allegations, which we must, of course, accept as true. In this regard, we also deny as moot two pending motions filed by Ridpath with respect to these exhibits and other materials submitted by the Appellants — the "Appellee's Motion to File Sur Reply to Appellants' Reply," filed on January 28, 2005, and the "Appellee's Motion to Strike Appellants' Notice of Decision Regarding Dr. Ridpath's Level IV Grievance," filed on February 11, 2005.

— with a local business known as McCorkle Machine Shop. *Id.* at ¶¶ 21-22.

Prior to the investigation, Ridpath had no knowledge of the props' employment at the Machine Shop, as the relevant information was not (but should have been) reported to the University's Compliance Office. *See* Amended Complaint at ¶¶ 22, 24. During the investigation, members of the coaching staff attempted to cover up their wrongdoing, and Coach Pruett, in testimony, suggested that Ridpath and the Compliance Office were to blame for any improprieties. *Id.* at ¶¶ 23, 25-26. Meanwhile, Ridpath was not allowed to personally interview witnesses or investigate facts relating to the props' employment at the Machine Shop. *Id.* at ¶ 27. Indeed, he was specifically directed not to interview the Machine Shop's owner, Marshall Reynolds (who had a history of involvement in NCAA infractions at the University), a directive that came from Cottrill, Hilliard, and Coach Pruett. *Id.* They and Angel encouraged Ridpath, however, to defend the University vigorously throughout the investigation and at a hearing conducted on September 22, 2001, by the NCAA's Committee on Infractions. *Id.* at ¶¶ 30-32. Cottrill and Hilliard also assured Ridpath on several occasions that he did not need personal legal representation during the NCAA proceedings. *Id.* at ¶ 51(a). Ridpath's defense of the University was not well received by the NCAA committee. *Id.* at ¶ 38. Thereafter, although Ridpath had not been involved in the NCAA rules violations, he became a "convenient scapegoat" for the University. *Id.* at ¶¶ 38-39.

On approximately October 1, 2001, Ridpath agreed to be reassigned from being the University's Compliance Director to become its Director of Judicial Programs, despite lacking the necessary education or training for this position. *See* Amended Complaint at ¶¶ 33-34.[4]

---

[4]Ridpath's chosen profession is intercollegiate athletics administration, but the Director of Judicial Programs is a position outside the University's Department of Athletics. *See* Amended Complaint at ¶¶ 14-15, 35. According to information available through the University's website, the Director of Judicial Programs oversees enforcement of the University's Code of Student Rights and Responsibilities, which outlines standards of expected student conduct and establishes disciplinary procedures for violations of these standards. *See* http://www.marshall.edu/judicial%2D affairs.

Ridpath consented to this reassignment "for numerous reasons both personal and professional." *Id.* at ¶ 33. Ridpath was given a raise to accept the new position, and, at the time he filed the Amended Complaint, he was being paid some $15,000 more annually than his predecessor as Director of Judicial Programs. *Id.* at ¶ 34. As an additional inducement for the transfer, Cottrill and Grose (as agents of the University) agreed to inform the NCAA and the public that Ridpath's reassignment was not the result of any wrongdoing on his part as Compliance Director. *Id.* at ¶ 35. In contravention of this agreement, however, Hilliard subsequently informed the NCAA that Ridpath's reassignment was a "corrective action" taken by the University to remedy its NCAA rules violations. *Id.* at ¶ 36.

Ridpath was excluded from the decisionmaking process with respect to the designation of his transfer as a "corrective action." *See* Amended Complaint at ¶ 51(b). Moreover, during a meeting held on approximately November 1, 2001, concerning the University's violation of its agreement with Ridpath, Cottrill warned Ridpath: "You [Ridpath] have no say in the matter. You need to think about your family young man." *Id.* at ¶ 57(a) (alteration in original). At this same meeting, Grose threatened Ridpath: "I am telling you. You do anything to resurrect this [NCAA Infractions issues] and I will bury you personally and professionally." *Id.* (alteration in original).

On December 21, 2001, the NCAA Committee on Infractions published its report (the "Infractions Report"). *See* Amended Complaint at ¶ 57(b). Its findings included two major NCAA rules violations — academic fraud and impermissible employment of props at the Machine Shop — and it labeled Ridpath's reassignment as a "corrective action" taken in response to these infractions. *Id.* at ¶¶ 37, 41, 51(c). An advance copy of the Infractions Report had been provided to the University and, in the days leading up to its public release, a group of school officials met to review and discuss it. *Id.* at ¶ 57(b). During this meeting, some participants raised concerns about "cheap shots" taken against Ridpath in the Infractions Report. *Id.* Additionally, the group discussed the fact that Ridpath would wish to clear his name. *Id.* In this regard, Angel, the University's President, asserted that he "would cut the dead limb from the tree" if Ridpath commented publicly. *Id.* Angel further stated that he had previously dealt with similar situations, and that he would have "no problem firing [Rid-

path] on the spot" if he spoke publicly about the NCAA investigation. *Id.* Because of the threats articulated by Angel, and those previously made by Cottrill and Grose, Ridpath initially refrained from publicly challenging the findings of the Infractions Report and the "corrective action" label that had been placed on his reassignment. *Id.* at ¶ 58.

Later, however, Ridpath retained counsel and filed a civil action based on alleged constitutional violations. *See* Amended Complaint at ¶ 62.[5] Subsequently, on July 14, 2003, Ridpath was relieved of his responsibilities as an Adjunct Professor in the Exercise and Sports Science Department (but not as the Director of Judicial Programs). *Id.* at ¶¶ 46, 59. During related grievance proceedings, a University official acknowledged under oath that Ridpath was discharged from his teaching position due to negative comments he made about the University's conduct during the NCAA investigation. *Id.* at ¶¶ 47, 61.

As of the filing of the Amended Complaint in these proceedings, Ridpath remained in his position as the University's Director of Judicial Programs. *See* Amended Complaint at ¶¶ 1, 34. Meanwhile, he continued to apply to other colleges and universities for a position in his chosen field, as a compliance director or other intercollegiate athletics administrator. *Id.* at ¶¶ 42, 52. He was unable to procure other employment, however, because his professional reputation had been permanently damaged by the "corrective action" label placed on his reassignment from Marshall University's Department of Athletics. *Id.* at ¶ 52. According to the Amended Complaint, this label "calls into question his honesty, integrity and professional competence as an NCAA Compliance Coordinator," destroying his future career opportunities in intercollegiate athletics. *Id.* at ¶¶ 40-41. And, despite the devastating effect of the "corrective action" label, no means were available to Ridpath under NCAA bylaws to challenge it or the other contents of the Infractions Report. *Id.* at ¶ 51(c).

---

[5]In December 2002, Ridpath filed a complaint against several of the Defendants herein, making allegations similar to those in these proceedings. On July 8, 2003, that civil action — deemed a separate lawsuit from these proceedings in the district court and assigned a different case number — was voluntarily dismissed without prejudice by Ridpath.

B.

On August 4, 2003, Ridpath instituted these proceedings with the filing of his Initial Complaint against the Board, the Administrators, and Coach Pruett. In the Initial Complaint, Ridpath alleged, *inter alia*, the three § 1983 claims: specifically, that the Board had violated his Fourteenth Amendment right to due process (the "due process claim"); and that the Board, the Administrators, and Coach Pruett had infringed on his First Amendment right to free speech in two distinct ways (the "free speech claims").[6] On September 15, 2003, the Board and the Administrators, without answering the Initial Complaint, sought dismissal under Rule 12(b)(6) or, in the alternative, transfer to the appropriate state court. On September 30, 2003, Coach Pruett separately sought a Rule 12(b)(6) dismissal. In their motions and supporting memoranda of law (collectively, the "September 2003 Motions"), these Defendants asserted multiple bases for dismissal, but never contended that qualified immunity shielded any of them from suit.[7]

On October 20, 2003, Ridpath filed a response in opposition to the motions to dismiss. Subsequently, on October 30, 2003, the Board and the Administrators filed a reply to Ridpath's response (the "Octo-

---

[6]Ridpath asserted each of the two free speech claims against the Board and the Administrators, and only one of them against Coach Pruett.

[7]In their Rule 12(b)(6) effort, the Board and the Administrators raised thirteen grounds, five of which pertained to the § 1983 claims, as follows:

   (1)   that they were entitled to Eleventh Amendment immunity;

   (2)   that they were entitled to witness immunity;

   (3)   that Ridpath did not possess a constitutionally protected property right in his employment with the University;

   (4)   that they did not infringe on Ridpath's First and Fourteenth Amendment rights; and

   (5)   that Ridpath had failed to join Hilliard, an indispensable party.

In Coach Pruett's separate motion, he asserted three grounds for relief, including Eleventh Amendment immunity.

ber 2003 Reply Brief"). Therein, they asserted and argued, for the first time, the defense of qualified immunity. Even then, their discussion of this defense was limited to a few paragraphs inserted in the midst of a largely unrelated argument on Eleventh Amendment immunity.

On December 19, 2003, while the September 2003 Motions were pending, Ridpath sought leave to amend the Initial Complaint. On January 20, 2004, the district court authorized the filing of the Amended Complaint, *nunc pro tunc* to December 19, 2003. The Amended Complaint alleged the same causes of action as those in the Initial Complaint. The Amended Complaint added Hilliard as a Defendant, however, and it asserted the due process claim against the Board, the Administrators, and Hilliard (instead of against the Board alone, as in the Initial Complaint). As for the other § 1983 claims, the Amended Complaint reasserted the two free speech claims against the same Defendants, *i.e.*, the Board, the Administrators, and (on one of the two claims only) Coach Pruett.[8]

In early February 2004, the Board, the Administrators, and Coach Pruett filed Rule 12(b)(6) motions to dismiss the Amended Complaint (collectively, the "February 2004 Motions"). Shortly thereafter, on February 17, 2004, the district court filed its Opinion, ruling on the September 2003 Motions (which had sought dismissal of the Initial Complaint), and applying those motions to the Amended Complaint. The Opinion did not address the February 2004 Motions (which had been directed to the Amended Complaint).[9] Although qualified immu-

---

[8]In addition to the three § 1983 claims at issue in these appeals, Ridpath alleged, in both the Initial Complaint and the Amended Complaint, a separate claim under § 1983 for civil conspiracy. He also asserted six state law claims, arising under the Constitution of West Virginia and state common law.

[9]The February 2004 Motions included the following: Coach Pruett's February 5, 2004 motion to dismiss, incorporating by reference his earlier dismissal motion and asserting no additional grounds; and the Board's February 12, 2004 motion to dismiss or, alternatively, to transfer these proceedings to state court. The Board's motion was accompanied by a memorandum of law submitted in its name, as well as those of the Administrators (who were not named as movants in the motion to dis-

nity was not raised by the Board and the Administrators in their September 2003 Motion, but rather only in their October 2003 Reply Brief, the court ruled on this defense. The court concluded that the Board and the Administrators were not entitled to qualified immunity on the § 1983 claims as alleged in the Amended Complaint. *See* Opinion at 15.[10]

On March 5, 2004, the Board and the Administrators filed a notice of interlocutory appeal. On March 12, 2004, Coach Pruett filed a similar notice. They collectively seek review of the district court's February 17, 2004 qualified immunity ruling.[11]

---

miss). This memorandum reasserted many of the grounds relied on by the Board and the Administrators in support of their earlier dismissal motion; however, unlike the October 2003 Reply Brief, the memorandum did not articulate any claims of qualified immunity. These anomalies in the February 2004 Motions — *i.e.*, the failure to raise qualified immunity and the omission of the Administrators as movants — are immaterial in these appeals, because the qualified immunity ruling at issue was made pursuant to only the September 2003 Motions.

[10]On February 25, 2004, after the district court filed its Opinion, Hilliard sought dismissal of the Amended Complaint on the basis of, *inter alia*, qualified immunity. On February 27, 2004, Coach Pruett filed an answer to the Amended Complaint, invoking qualified immunity. Those qualified immunity claims were the first raised by Hilliard and Coach Pruett.

[11]After the filing of the notices of appeal, the district court ruled on the February 2004 Motions. Specifically, on April 27, 2004, the court disposed of Coach Pruett's February 5, 2004 motion to dismiss (in which qualified immunity was not at issue). Also on April 27, 2004, the court granted the unopposed motion of the Board and the Administrators to stay the district court proceedings pending our disposition of these appeals. Despite this stay, the district court proceedings continued, and, on September 23, 2004, the court ruled on the Board's February 12, 2004 motion to dismiss. In rendering its decision on that motion, the court did not disturb its earlier qualified immunity ruling of February 17, 2004, which remains the sole subject of these appeals.

## II.

The interlocutory nature of these appeals, and the somewhat tortuous course of the district court proceedings, cause us to question our jurisdiction. We therefore must first assess whether these appeals are properly before us. *See Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 278 (1977) (observing that appellate courts are obliged to inquire into jurisdictional issues sua sponte whenever doubt arises as to existence of jurisdiction).[12]

### A.

Normally, of course, a district court's denial of a Rule 12(b)(6) motion is not an appealable ruling, because it is not a final order under 28 U.S.C. § 1291. *Jenkins v. Medford*, 119 F.3d 1156, 1159 (4th Cir. 1997) (en banc). The Appellants rely, however, on the collateral order doctrine, under which the Supreme Court has carved out a "small class" of trial court decisions that, though short of final judgment, are immediately appealable. *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). Such decisions are appealable because they "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Id.*

In *Mitchell v. Forsyth*, the Court held that the denial of qualified immunity is immediately appealable under the collateral order doctrine to the extent that the availability of this defense turns on a question of law. 472 U.S. 511, 530 (1985). This principle applies whether qualified immunity was rejected at the dismissal stage (as in these proceedings), or at the summary judgment stage. *See Jenkins*, 119 F.3d at 1159 & n.2 (citing *Behrens v. Pelletier*, 516 U.S. 299, 307 (1996)). Accordingly, the Board, the Administrators, and Coach Pruett have properly invoked the collateral order doctrine.

---

[12]Following oral argument, we requested supplemental briefing from the parties on the jurisdictional issues. Although Ridpath had not previously challenged our jurisdiction, he did so in his supplemental submission. Meanwhile, the Appellants continued to maintain that we possess jurisdiction over their appeals.

B.

Our jurisdictional assessment does not, however, end here. Only if a party has standing to appeal do we possess authority to decide the merits of his contentions. *See Davis v. Scott*, 176 F.3d 805, 807 (4th Cir. 1999) (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 549 (1986)). And, for standing to appeal, a party must be "aggrieved" by a trial court's judgment. *H.A. Health Serve. v. Metro. Life Ins. Co.*, 957 F.2d 120, 123 (4th Cir. 1992).

In these proceedings, the district court ruled only that the Board and the Administrators are not entitled to qualified immunity on the § 1983 claims. The court thus did not address the availability of this defense to Coach Pruett — and had no reason to do so, as he had not raised qualified immunity as of the filing of the Opinion. Coach Pruett therefore was not aggrieved by the court's qualified immunity ruling, and we must dismiss his appeal. By contrast, the Board and the Administrators were aggrieved by the Opinion, because it denied their claims of qualified immunity. Thus, they have standing to appeal.

C.

Finally, however, there remains some doubt on whether we should consider the merits of the appeal by the Board and the Administrators, because they belatedly raised their claims of qualified immunity, in their October 2003 Reply Brief. We observe that qualified immunity is an affirmative defense, and the burden of pleading it "rests with the defendant." *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *see also Sales v. Grant*, 224 F.3d 293, 296 (4th Cir. 2000) (recognizing that qualified immunity can be waived if not "squarely presented" to district court). Generally, qualified immunity must be raised in an answer or a dismissal motion. *See* Fed. R. Civ. P. 8(c) ("In pleading to a preceding pleading, a party shall set forth affirmatively . . . any other matter constituting an avoidance or affirmative defense."); Fed. R. Civ. P. 12(b)(6) (allowing defense of failure to state claim upon which relief can be granted to be raised by pre-answer motion). Moreover, where — as here — defendants raise an issue such as qualified immunity only in a reply brief, a district court is entitled to refuse to consider it at that stage of the proceedings. *See, e.g.*, *Montalvo v. Park Ridge Police Dep't*, 170 F. Supp. 2d 800, 803 (N.D. Ill. 2001). And,

we may refuse to consider this defense on appeal if it was not pre-served below. *See Suarez Corp. Indus. v. McGraw*, 125 F.3d 222, 226 (4th Cir. 1997); *Buffington v. Balt. County*, 913 F.2d 113, 122 (4th Cir. 1990).

We are not, however, precluded from considering an affirmative defense that was not properly asserted in the trial court, if the court has nonetheless chosen to address it. *See, e.g.*, *Curry v. Syracuse*, 316 F.3d 324, 330-31 (2d Cir. 2003) (affirming district court's application of collateral estoppel over plaintiff's contention that defendant waived defense by raising it only in supplemental memorandum to pending summary judgment motion). Such review is particularly appropriate if the plaintiff suffers no prejudice, and if hearing the appeal serves "the strong public policy in economizing the use of judicial resources by avoiding relitigation." *See id.* at 331 (internal quotation marks omitted).

Here, we cannot say that Ridpath was prejudiced by the district court's consideration of the untimely qualified immunity claims of the Board and the Administrators. Indeed, the court rejected them. More-over, although there is no indication in the record that Ridpath was allowed to respond to these claims, it also does not appear that he sought to do so. Ridpath fully addressed the relevant qualified immu-nity issues in his submissions to us, and he did not initially object to our jurisdiction. In these circumstances, and in the interest of judicial economy, we will consider the merits of the qualified immunity claims of the Board and the Administrators.

III.

We review de novo the denial of a motion to dismiss based on qualified immunity, accepting as true the facts alleged in the com-plaint and viewing them in the light most favorable to the plaintiff. *See Jenkins v. Medford*, 119 F.3d 1156, 1159 (4th Cir. 1997) (en banc). Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil dam-ages under § 1983, "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see*

*also Kentucky v. Graham*, 473 U.S. 159, 165-67 (1985). Government officials are entitled to the defense of qualified immunity unless a § 1983 claim satisfies the following two-prong test (the "qualified immunity test"): (1) the allegations underlying the claim, if true, substantiate the violation of a federal statutory or constitutional right; and (2) this violation was of a "clearly established" right "of which a reasonable person would have known." *See Mellen v. Bunting*, 327 F.3d 355, 365 (4th Cir. 2003) (citing *Hope v. Pelzer*, 536 U.S. 730, 736 (2002); *Harlow*, 457 U.S. at 818) (internal quotation marks omitted); *see also Wilson*, 526 U.S. at 609.

## A.

In view of basic principles of qualified immunity, we can easily dispose of the Board's assertions of this defense. Qualified immunity may be invoked by a government official sued in his personal, or individual, capacity. *See Graham*, 473 U.S. 159 at 165-67. This defense is not available in an official-capacity suit brought against a government entity or a government officer as that entity's agent. *Id.* In these proceedings, the Board was named as a defendant in its capacity as a "public institution," *i.e.*, as the proper party to be sued on behalf of the University. *See* Amended Complaint at ¶ 2. And, an action against an entity like the Board is necessarily an official-capacity suit. *See Graham*, 473 U.S. at 165-66. Accordingly, the Board is not entitled to the qualified immunity defense. *See id.* at 166-67. We therefore affirm the district court's denial of qualified immunity to the Board on the § 1983 claims. We also recognize that, to the extent Ridpath's claims are asserted against the Administrators in their official capacities, the Administrators likewise are not entitled to qualified immunity.[13]

---

[13]The § 1983 claims against the Administrators in their official capacities are essentially duplicative of the § 1983 claims against the Board. *See Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004) (citing *Graham*, 473 U.S. at 165-66). Although the Board and the Administrators, in their official capacities, are not entitled to qualified immunity on the § 1983 claims, they may be entitled to other immunities and defenses. *See Graham*, 473 U.S. at 167. For example, the district court ruled that the Eleventh Amendment bars Ridpath from obtaining money damages (but not prospective injunctive relief) from any of the official-capacity Defendants on the § 1983 claims, *see* Opinion at 8, a ruling not before us in these appeals.

In their individual capacities, however, the Administrators may yet possess colorable claims of qualified immunity. We assess these claims in turn, focusing on the Administrators' assertions of qualified immunity with respect to, first, the due process claim and, second, the free speech claims.

### B.

Under the qualified immunity test, the initial question with respect to the due process claim is whether Ridpath has sufficiently alleged the violation of a Fourteenth Amendment right. *See Mellen*, 327 F.3d at 365. The next question is whether, at the time of the Administrators' alleged conduct, this right was a clearly established one of which a reasonable person would have known. *Id.* For the following reasons, Ridpath's due process claim satisfies each of these prongs, and the district court's denial of qualified immunity on this claim must be affirmed.

### 1.

With respect to his due process claim, Ridpath has identified the constitutional right at issue as the right to procedural due process when governmental action threatens a person's liberty interest in his reputation and choice of occupation. *See Bd. of Regents v. Roth*, 408 U.S. 564, 573 & n.12 (1972) (recognizing that notice and hearing would have been required if "[t]he State, in declining to rehire the respondent, [had made] any charge against him that might seriously damage his standing and associations in his community" or had "imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities"); *cf. Conn v. Gabbert*, 526 U.S. 286, 291-92 (1999) (observing that "the liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment, but a right which is nevertheless subject to reasonable government regulation").[14] In support of this claim, Ridpath

---

[14]As the Supreme Court has recognized, "[t]he requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property."

asserts that, by placing the "corrective action" label on his reassign-
ment from Compliance Director to Director of Judicial Programs at
the University, the Administrators knowingly foreclosed his career
opportunities in his chosen field of intercollegiate athletics adminis-
tration without allowing him an opportunity to defend himself. *See*
Amended Complaint at ¶¶ 40, 51.

Ridpath maintains that he was not provided any procedural safe-
guards with respect to the use of the "corrective action" label. The
Amended Complaint specifically alleges that Ridpath was not to
blame for the NCAA rules violations, and excluded from participating
in much of the related investigation, but that he was nonetheless made
a "scapegoat" for the infractions; that he was discouraged from retain-
ing personal counsel during the investigation; that the decision to
place the "corrective action" label on his reassignment was made
without his input and in contravention of an agreement between him
and the University; and that he had no means to challenge this label
or other aspects of the Infractions Report. The Administrators do not
dispute that these allegations are sufficient to establish a lack of pro-
cedural safeguards.

The Administrators contend, however, that they were not required
to provide Ridpath with any procedural safeguards, because the "cor-
rective action" label did not implicate a protected liberty interest.
Relying on precedent establishing the elements of a valid liberty inter-
est claim, they maintain that the Amended Complaint's allegations are
insufficient to establish the following (collectively, the "liberty inter-
est contentions"): (a) that the "corrective action" label constituted a
charge of a serious character defect; (b) that this label accompanied
any damage to Ridpath's employment status; (c) that it was made
public; and (d) that it was false. We are thus obliged to assess the
Administrators' four liberty interest contentions, in order to determine

*Roth*, 408 U.S. at 569. In order to have a protected property interest in
his employment, a person must possess a legitimate claim of entitlement
to it — created, for example, by contract or state law. *See id.* at 577-78;
*Robertson v. Rogers*, 679 F.2d 1090, 1091 (4th Cir. 1982). Ridpath, an
at-will employee of the University, is not claiming any protected prop-
erty interest in his employment.

whether Ridpath has sufficiently alleged a Fourteenth Amendment violation and thus satisfied the first prong of the qualified immunity test.

a.

The first of the liberty interest contentions is that the "corrective action" label did not implicate a protected liberty interest because it cannot be understood to constitute a charge of a serious character defect.[15] The type of communication that gives rise to a protected liberty interest implies "the existence of serious character defects such as dishonesty or immorality." *Robertson v. Rogers*, 679 F.2d 1090, 1092 (4th Cir. 1982) (citing *Roth*, 408 U.S. at 573). In assessing liberty interest claims, we have distinguished statements that imply such serious character defects from statements that simply allege "incompetence." *Compare Boston v. Webb*, 783 F.2d 1163, 1165-66 (4th Cir. 1986) (recognizing that plaintiff's liberty interest "was surely implicated" by public announcement that he was discharged after failing to disprove allegation of receiving bribe), *Cox v. N. Va. Transp. Comm'n*, 551 F.2d 555, 557-58 (4th Cir. 1976) (affirming trial court's determination that plaintiff's liberty interest was infringed when employer publicly linked her discharge to investigation of financial irregularities, thus "insinuating dishonesty"), *and McNeil v. Butz*, 480 F.2d 314, 319-20 (4th Cir. 1973) (concluding that federal employees' liberty interests were implicated by government-employer's charges of Agriculture Department regulation violations that "smack of deliberate fraud" and "in effect allege dishonesty"), *with Zepp v. Rehrmann*, 79 F.3d 381, 388 (4th Cir. 1996) (rejecting deprivation of liberty interest claim where employer announced that plaintiff was being forced to retire "due to management problems" — an accusation, at most, "of incompetence or unsatisfactory job performance"), *and Robertson*, 679 F.2d at 1091-92 (concluding that liberty interest was not implicated by nonrenewal of employment contract for "incompe-

---

[15]On this issue and others, the Administrators extensively rely on unpublished decisions of this Court. Of course, under Local Rule 36(c), citations to unpublished decisions are disfavored. These citations might be warranted if, for example, there were no published decision on point. Because such circumstances are not present here, however, we do not address the unpublished decisions cited by the Administrators.

tence and outside activities," because such allegations did not involve attack on plaintiff's integrity or honor).

The Administrators maintain that, by using the "corrective action" label, they provided no reasons for Ridpath's reassignment, or at least indicated nothing more than that he was incompetent as Compliance Director. Ridpath alleges, however, that this label calls into question not only his "professional competence as an NCAA Compliance Coordinator," but also his "honesty" and "integrity." Amended Complaint at ¶ 41. Of course, we are obliged, in applying Rule 12(b)(6) principles, to accept the allegations of the Amended Complaint as true and to view them in the light most favorable to Ridpath. *See Jenkins*, 119 F.3d at 1159. Utilizing this standard, we agree with Ridpath: the Administrators' use of the "corrective action" label lays blame on him for the University's NCAA rules violations — including academic fraud and impermissible employment of props at the Machine Shop — and thus insinuates "the existence of serious character defects such as dishonesty or immorality." *Robertson*, 679 F.2d at 1092. Indeed, Ridpath contends that, within the intercollegiate athletics community in particular, the use of the "corrective action" label in this context is typically understood to connote dishonesty and other serious character defects on the part of the label's bearer. This, as the district court recognized, is a question of fact, not properly assessed on a Rule 12(b)(6) motion. We therefore reject the Administrators' first liberty interest contention, that the "corrective action" label cannot be understood to imply a serious character defect.

b.

The Administrators' second liberty interest contention is that the "corrective action" label did not implicate a protected liberty interest because it did not accompany damage to Ridpath's employment status. We have required that, in order to deprive an employee of a liberty interest, a public employer's stigmatizing remarks must be "made in the course of a discharge or significant demotion." *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 n.5 (4th Cir. 1988) (citing *Lawson v. Sheriff of Tippecanoe County*, 725 F.2d 1136, 1139 (7th Cir. 1984); *Mosrie v. Barry*, 718 F.2d 1151, 1160-62 (D.C. Cir. 1983); *Moore v. Otero*, 557 F.2d 435, 438 (5th Cir. 1977)). As established in decisions of our sister circuits on which we relied in *Stone*,

such a "significant demotion" may include the reassignment of an employee to a position outside his field of choice. *See Lawson*, 725 F.2d at 1139; *Moore*, 557 F.2d at 438 & n.11.[16]

The Administrators disregard the gravity of Ridpath's reassignment outside the Department of Athletics, from Compliance Director to Director of Judicial Programs. Rather, the Administrators essentially contend that Ridpath, having "voluntarily" changed positions, was neither discharged nor given a significant demotion. Properly assessing Ridpath's allegations in the light most favorable to him, however, these allegations establish that Ridpath's reassignment was neither voluntary nor an innocuous transfer. Rather, it was a significant

---

[16]*Stone* and the decisions relied on therein followed the Supreme Court's decision in *Paul v. Davis*, 424 U.S. 693 (1976), explaining its earlier decision in *Roth*. The plaintiff in *Paul* had asserted a § 1983 claim based on allegations that the defendant-police chief had included the plaintiff's name and photograph on a flyer of "Active Shoplifters" distributed for posting by local merchants, thus branding him as a criminal and seriously impairing his future employment opportunities. *See* 424 U.S. at 697. In rejecting this claim as one for defamation alone, the Supreme Court characterized its previous decision in *Roth* as recognizing "that governmental action defaming an individual *in the course of declining to rehire him* could entitle the person to notice and an opportunity to be heard as to the defamation." *Paul*, 424 U.S. at 709-10 (citing *Roth*, 408 U.S. at 573) (emphasis added). The *Paul* Court deemed the language of *Roth* to be "inconsistent with any notion that a defamation perpetrated by a government official but unconnected with any refusal to rehire would be actionable under the Fourteenth Amendment." *Paul*, 424 U.S. at 709. Accordingly, under what is sometimes referred to as its "stigma plus" test, the *Paul* Court instructed that no deprivation of a liberty interest occurs when, in the course of defaming a person, a public official solely impairs that person's *future* employment opportunities, without subjecting him to a *present* injury such as termination of government employment. *Id.*; *accord Siegert v. Gilley*, 500 U.S. 226, 233 (1991) ("Defamation, *by itself*, is a tort actionable under the laws of most States, but not a constitutional deprivation." (emphasis added)); *see also Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990) ("Publication of stigmatizing charges alone, without damages to 'tangible interests such as employment,' does not invoke the due process clause." (quoting *Paul*, 424 U.S. at 701)).

demotion to a position outside his chosen field, rendering it tantamount to an outright discharge.

The Amended Complaint paints an ugly picture of the circumstances surrounding Ridpath's reassignment. As a key component to the scheme to make him a "scapegoat" for the University's NCAA rules violations, Ridpath was banished from the Department of Athletics. He was then relegated to a position for which he lacked the necessary education and training — a position that may have been prized by others, but to Ridpath constituted, at best, a perilous detour on his career path and, at worst, a dead end. Ridpath had to be persuaded to accept this transfer with the offer of significant inducements. Hence, he was given a pay raise, and was eventually making $15,000 more than the previous Director of Judicial Programs. More importantly, he was also falsely promised that he would be exonerated of blame for the athletics program infractions. Once this promise was broken and his reassignment was characterized as a "corrective action" to the NCAA, Ridpath was threatened against publicly challenging this label or the other conclusions in the Infractions Report. Cottrill warned Ridpath that "[y]ou need to think about your family young man." Amended Complaint at ¶ 57(a). Grose threatened to "bury [Ridpath] personally and professionally." *Id.* And Angel, the University's President, asserted that he "would cut the dead limb from the tree" and would have "no problem firing [Ridpath] on the spot" if he commented publicly. *Id.* at ¶ 57(b). These circumstances belie any notion that Ridpath's reassignment cannot be considered a significant demotion. Indeed, the circumstances strongly suggest that the Administrators knew the reassignment constituted a significant demotion and thus attempted to frame it as a voluntary transfer, so that if their attempts to muzzle Ridpath failed, they could still evade liability in any future litigation.

Under our precedent, Ridpath's allegations are more than sufficient to show that he was subjected to an involuntary and significant demotion in connection with the stigmatizing "corrective action" label. First of all, we have spelled out that a change in employment status is not voluntary if it is "obtained by the employer's misrepresentation or deception" or "forced by the employer's duress or coercion." *Stone*, 855 F.2d at 174. The circumstances alleged here — including the ruse that Ridpath would not be blamed for the NCAA rules violations if

he agreed to the reassignment — are squarely within the *Stone* standard. *Cf. id.* at 172 n.5, 175 (concluding that, absent showing of either misrepresentation or coercion, *Stone* plaintiff voluntarily resigned his employment and thus could not sustain liberty interest claim).

Moreover, the *Lawson* and *Moore* decisions, on which we relied in *Stone*, establish that the reassignment of an employee to a position outside his field of choice may very well constitute a "significant demotion" sufficient to invoke due process protections.[17] In *Lawson*, the Seventh Circuit specifically recognized that "[t]he concept of liberty in Fourteenth Amendment jurisprudence has long included the liberty to follow a trade, profession, or other calling." 725 F.2d at 1138. The court further observed that an employee's liberty interest may be infringed by a firing or other employment action that serves to "exlu[de him] from his occupation." *Id.* at 1139. Accordingly, the court held that a public employer cannot avoid liability "by offering the employee a job far beneath the one he had," where being so demoted "is to be as effectively excluded from one's trade or calling as by being thrown out on the street." *Id.* Similarly, in *Moore*, the Fifth Circuit recognized that the internal transfer of an employee would support a liberty interest claim if the transfer "constitutes such a change of status as to be regarded essentially as a loss of employment." 557 F.2d at 438.[18] The circumstances of Ridpath's reassignment fit neatly with those that the *Lawson* and *Moore* courts have recognized, with our approval, would support a liberty interest claim. Ridpath was not simply transferred from one position to a slightly less desirable or even a better one (no matter what his salary as Director of Judicial Programs or how appealing that position might have been

---

[17]The third decision of a sister circuit on which we relied in *Stone* — the D.C. Circuit's decision in *Mosrie* — is not on point with the issues herein. *See Mosrie*, 718 F.2d at 1161 (concluding that lateral transfer within same line of work, with no reduction in rank or pay, did not constitute deprivation of liberty).

[18]Unlike the *Lawson* court, the *Moore* court did not explicitly discuss the significance of one's liberty interest in pursuing a chosen occupation or calling. However, as an example of the type of internal transfer that might support a liberty interest claim, the *Moore* court identified a hypothetical demotion from police corporal to janitor (which, obviously, would constitute a change in line of work). *See* 557 F.2d at 438 n.11.

to others). Rather, in a dramatic change of status equivalent to out-right discharge, he was ousted from the University's Department of Athletics and completely excluded from his chosen field of intercolle-giate athletics administration.[19] We therefore reject the Administra-tors' second liberty interest contention, that the "corrective action" label did not accompany damage to Ridpath's employment status suf-ficient to invoke his right to procedural due process.[20]

c.

The Administrators' third liberty interest contention is that the "corrective action" label did not implicate a protected liberty interest, as it was not made public. In order to invoke due process protections, a charge of a serious character defect must be publicly disclosed. *See Wooten v. Clifton Forge Sch. Bd.*, 655 F.2d 552, 555 (4th Cir. 1981);

---

[19]These facts stand in stark contrast to those that have been deemed insufficient to support liberty interest claims. In *Johnson v. Morris*, for example, we rejected the liberty interest claim of a plaintiff who was merely demoted from one position to another within the Virginia Depart-ment of Corrections, presumably with no change in line of work (as there was no allegation to the contrary). *See* 903 F.2d 996, 997-99 (4th Cir. 1990). Likewise, in *Moore*, the Fifth Circuit concluded that no liberty interest was implicated where the plaintiff was only demoted from police corporal to patrolman. *See* 557 F.2d at 438.

[20]In his dissent on this aspect of the Administrators' appeal, our distin-guished colleague mischaracterizes Ridpath's due process claim as one for defamation alone and, in so doing, erroneously analogizes the facts before us to those presented in *Siegert v. Gilley*, 500 U.S. 226 (1991). There, the Supreme Court rejected the plaintiff-employee's liberty inter-est claim for failure to satisfy the "stigma plus" test previously outlined in *Paul v. Davis*, 424 U.S. 693, 709-10 (1976) (recognizing that defama-tory remark may implicate liberty interest *if* made in connection with dis-charge from employment). *See Siegert*, 500 U.S. at 233-34; *see also supra* note 16. In rejecting Siegert's liberty interest claim, the Court explained that "[t]he alleged defamation was not uttered incident to the termination of Siegert's employment," in that (1) "he voluntarily resigned from his position," and (2) the alleged defamation did not occur until "several weeks later." *Siegert*, 500 U.S. at 234. Here, by stark con-trast, the alleged defamation — the use of the "corrective action" label — occurred incident to Ridpath's involuntary and significant demotion.

*Fuller v. Laurens County Sch. Dist. No. 56*, 563 F.2d 137, 141 (4th Cir. 1977). In this matter, Ridpath has plainly alleged that the "corrective action" label was communicated to the NCAA and to the public at large. Rather than disputing the sufficiency of this allegation, the Administrators contend that absolute witness immunity shields them from liability for any otherwise public use of the "corrective action" label during the NCAA administrative process. *See generally Briscoe v. LaHue*, 460 U.S. 325 (1983) (recognizing that parties and witnesses are entitled to absolute immunity from damages liability for their testimony in judicial proceedings). Unfortunately for the Administrators, their appeal is premised not on a denial of witness immunity, but on the denial of qualified immunity only. As a result, their claims of witness immunity are not before us, and we must conclude that their third liberty interest contention is without merit.

d.

The Administrators' final liberty interest contention is that the "corrective action" label did not implicate a protected liberty interest because it did not constitute a false statement. There can be no deprivation of liberty unless the stigmatizing charges at issue are false. *See Stone*, 855 F.2d at 172 n.5. The Administrators assert that Ridpath has not alleged that his reassignment was not a "corrective action." This contention is belied by the Amended Complaint. Ridpath repeatedly disputes therein the central implication of the "corrective action" label, *i.e.*, that he was responsible for the University's NCAA rules violations. Indeed, the essence of Ridpath's due process claim is that he should have been provided notice and a hearing to prove his lack of culpability and clear his name. This is a matter in which the falsity of a stigmatizing charge is fervently contested — not, for instance, one in which the plaintiff had previously conceded the truth of stigmatizing charges, in effect acting as his own accuser and rendering a hearing useless. *Cf. McNeil*, 480 F.2d at 326. We therefore reject the Administrators' final liberty interest contention.

In summary, contrary to the Administrators' liberty interest contentions, the allegations of Ridpath's Amended Complaint and the reasonable inferences drawn therefrom establish that the Administrators publicly made a false charge against Ridpath, connoting dishonesty and other serious character defects on his part, in the course of sub-

jecting him to a significant demotion to a position outside his field of choice. Moreover, it is undisputed that the Amended Complaint reflects that Ridpath was not provided notice or an opportunity to be heard with respect to this charge. Ridpath therefore has sufficiently alleged the violation of his Fourteenth Amendment right to due process when a liberty interest is at stake. And, thus, the allegations underlying his due process claim satisfy the first prong of the qualified immunity test.

2.

Turning to the second prong of the qualified immunity test, we must next assess whether the Fourteenth Amendment right allegedly contravened by the Administrators was a "clearly established" right "of which a reasonable person would have known." *Mellen v. Bunting*, 327 F.3d 355, 365 (4th Cir. 2003) (internal quotation marks omitted). In its decision in *Hope v. Pelzer*, the Supreme Court clarified the appropriate inquiry on this issue. *See* 536 U.S. 730, 739-41 (2002); *see also Jones v. Buchanan*, 325 F.3d 520, 531-32 (4th Cir. 2003). As the Court explained, a constitutional right is clearly established when "its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope*, 536 U.S. at 739 (internal quotation marks omitted). That is, "'in the light of pre-existing law the unlawfulness must be apparent,'" *id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)), but "the very action in question [need not have] previously been held unlawful," *id.* (internal quotation marks omitted), because "'general statements of the law are not inherently incapable of giving fair and clear warning, and . . . a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question,'" *id.* at 741 (quoting *United States v. Lanier*, 520 U.S. 259, 270-71 (1997)). Thus, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* The "salient question" is whether the state of the law at the time of the events in question gave the officials "fair warning" that their conduct was unconstitutional. *Id.*

The key events alleged here — the labeling of Ridpath's reassignment outside the Department of Athletics as a "corrective action" without giving him notice or a hearing — occurred in late 2001. At

that time, the state of the law was such that the Administrators were on notice that their conduct infringed on a liberty interest held by Ridpath, rendering their failure to provide him with procedural safeguards a violation of his Fourteenth Amendment right to due process. Indeed, decades earlier, in its decision in *Board of Regents v. Roth*, the Supreme Court recognized that "notice and an opportunity to be heard are essential" when a public employee's liberty interest is infringed by a charge implying such serious character defects as "dishonesty[ ] or immorality" lodged in the course of an injury such as failure to rehire. *See* 408 U.S. 564, 573 (1972) (internal quotation marks omitted); *see also Siegert v. Gilley*, 500 U.S. 226, 233 (1991); *Paul v. Davis*, 424 U.S. 693, 709 (1976). In the wake of *Roth* and its progeny, we have reiterated and expounded on the requirements of such a liberty interest claim on numerous occasions.

We have provided, in several decisions, concrete examples of the types of public statements implying the existence of serious character defects such as dishonesty and immorality. *See Boston v. Webb*, 783 F.2d 1163, 1165-66 (4th Cir. 1986) (announcement that plaintiff was discharged after failing to disprove allegation of receiving bribe); *Cox v. N. Va. Transp. Comm'n*, 551 F.2d 555, 557-58 (4th Cir. 1976) (statement linking plaintiff's discharge to investigation of financial irregularities); *McNeil v. Butz*, 480 F.2d 314, 319-20 (4th Cir. 1973) (charges against government employees of Agriculture Department regulation violations such as fraudulently obtaining federal payments for farm operators). Of course, none of these decisions involved the use of the "corrective action" label in the course of an NCAA investigation. However, there is no logical distinction between, for instance, linking an employee's discharge to an investigation of financial irregularities, *see Cox*, 551 F.2d at 557-58, and tying Ridpath's reassignment from the Department of Athletics to the University's serious NCAA rules violations (as the "corrective action" label served to do). In each of these scenarios, the charge at issue can be understood to insinuate dishonesty and other serious character defects. Thus, our precedent gave the Administrators fair warning that the "corrective action" label was just the type of charge that implicates a protected liberty interest.[21]

---

[21]Our precedent also clarifies that, in order to sustain a liberty interest claim, the stigmatizing charge at issue must have been both publicized

Similarly, we have specified that a public employer's stigmatizing remarks may infringe on an employee's liberty interest if such remarks are "made in the course of a discharge or significant demotion." *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 n.5 (4th Cir. 1988). For that proposition, we relied on decisions of our sister circuits, including *Lawson v. Sheriff of Tippecanoe County*, 725 F.2d 1136, 1139 (7th Cir. 1984), and *Moore v. Otero*, 557 F.2d 435, 438 (5th Cir. 1977). Although we had no occasion to elaborate on the definition of "significant demotion" in *Stone*, the courts in *Lawson* and *Moore* did so, with our approval. And the definitions they provided — such as an offer of "a job far beneath the one he had," where being so demoted "is to be as effectively excluded from one's trade or calling as by being thrown out on the street" — squarely correspond with Ridpath's reassignment from Compliance Director to Director of Judicial Programs (a position wholly outside his chosen field). *See Lawson*, 725 F.2d at 1139. The Administrators therefore were provided with fair and clear warning that, by banishing Ridpath from the Department of Athletics, they were unlawfully subjecting him to a "significant demotion" within the meaning of *Stone* and authorities relied on therein.[22]

Finally, because it is undisputed that Ridpath was not provided any procedural safeguards with respect to the labeling of his reassignment as a "corrective action," it cannot be questioned that the Administra-

---

and false. *See, e.g.*, *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 n.5 (4th Cir. 1988); *Wooten v. Clifton Forge Sch. Bd.*, 655 F.2d 552, 555 (4th Cir. 1981). According to the Amended Complaint, the "corrective action" label was communicated to the NCAA and to the public at large, falsely conveying that Ridpath was at fault for the University's NCAA rules violations. Our precedent applies with obvious clarity to this alleged conduct.

[22]Moreover, the Administrators cannot have equated the circumstances of Ridpath's reassignment with the facts of *Stone*, in which we rejected the plaintiff's liberty interest claim on the ground that he had voluntarily resigned from his employment. *See* 855 F.2d at 172 n.5, 178. As we spelled out in *Stone*, a change in employment status is *not* voluntary if it is "obtained by the employer's misrepresentation or deception" or "forced by the employer's duress or coercion." *Id.* at 174. Viewing the allegations of the Amended Complaint in the light most favorable to Ridpath, the circumstances of his reassignment readily meet this standard.

tors contravened *Roth*'s requirement for "notice and an opportunity to be heard." *See* 408 U.S. at 573. Accordingly, accepting the allegations of the Amended Complaint as true, the Administrators contravened a clearly established Fourteenth Amendment procedural due process right of which a reasonable person would have known. They therefore are not entitled to qualified immunity at this stage of these proceedings on Ridpath's due process claim.

## C.

The Administrators next maintain that the district court erred in denying their Rule 12(b)(6) motion to dismiss Ridpath's free speech claims on qualified immunity grounds. The Administrators are entitled to qualified immunity on these claims unless each claim satisfies both prongs of the qualified immunity test. As explained below, we conclude that each claim meets this test.[23]

## 1.

The first question before us on the free speech claims is whether, as to each claim, Ridpath has sufficiently alleged a violation of a First Amendment right. *See Mellen v. Bunting*, 327 F.3d 355, 365 (4th Cir. 2003). Ridpath has raised two distinct free speech claims against the Administrators. First, he maintains that being relieved from his

---

[23]In affirming the district court's denial of qualified immunity to the Administrators on Ridpath's free speech claims, we emphasize that these proceedings are at the 12(b)(6) dismissal stage, and that we are thus required to accept as true the facts alleged in the Amended Complaint and view them in the light most favorable to Ridpath. *See Jenkins v. Medford*, 119 F.3d 1156, 1159 (4th Cir. 1997) (en banc). Based on the allegations of the Amended Complaint, we are unable to say that Ridpath cannot build a factual record to demonstrate that his clearly established First Amendment rights were contravened. Simply put, the qualified immunity issue is open for further assessment upon development of the factual record, and neither this decision nor the district court's Opinion precludes the Administrators from reasserting claims of qualified immunity at a later stage of these proceedings. *Cf. McVey v. Stacy*, 157 F.3d 271, 279 (4th Cir. 1998) (affirming district court's ruling to defer deciding qualified immunity issue until record better developed on plaintiff's First Amendment claim).

adjunct teaching position in the Department of Exercise and Sports Science constituted impermissible retaliation, in part "for his speaking out against [the University's] conduct during the NCAA infractions process," and in part for "having exercised his First Amendment right to petition the government for redress of grievance by retaining counsel and filing a civil action in response to . . . constitutional violations" (the "retaliation claim"). Amended Complaint at ¶¶ 61-62.[24] Second, he maintains that the Administrators threatened him professionally (and personally) if he spoke out publicly about the NCAA investigation and that, as a result, he "refrained from immediately and/or publicly challenging the NCAA Infractions Report and 'corrective action' label" (the "chilling claim"). *Id.* at ¶¶ 57-58. We assess in turn the sufficiency of the allegations underlying each free speech claim.

a.

With regard to the retaliation claim, a public employer contravenes a public employee's First Amendment rights when it discharges or "refuses to rehire [the] employee," or when it makes decisions relating to "promotion, transfer, recall, and hiring based on the exercise of" that employee's free speech rights. *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000) (internal quotation marks omitted).[25] In order to prove that a retaliatory employment action violated a public employee's free speech rights, the employee must satisfy the three prong-test we laid out in *McVey v. Stacy*, 157 F.3d 271 (4th Cir. 1998) (the "*McVey* test"). First, the public employee must have spoken as a citizen, not as an employee, on a matter of public concern. *Id.* at 277. Second, the employee's interest in the expression at issue

---

[24]We observe that Ridpath alleges that he was relieved of his teaching position, not his position as Compliance Director, in retaliation for the exercise of his First Amendment rights.

[25]Contrary to the Administrators' contention, a public employee need not have a protected property interest in his employment to state a retaliation claim. *See Mount Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 283-84 (1977) ("Even though he could have been discharged for no reason whatever, . . . he may nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms.").

must have outweighed the employer's "interest in providing effective and efficient services to the public." *Id.* Third, there must have been a sufficient causal nexus between the protected speech and the retaliatory employment action. *Id.* at 277-78.[26]

i.

Under the first prong of the *McVey* test, we must assess whether the Amended Complaint has sufficiently alleged that Ridpath's speech was as a private citizen on a matter of public concern. *See McVey*, 157 F.3d at 277. An employee's speech involves a matter of public concern if it addresses "an issue of social, political, or other interest to a community." *Urofsky v. Gilmore*, 216 F.3d 401, 406-07 (4th Cir. 2000) (en banc). Importantly, "the place where the speech occurs is irrelevant: An employee may speak as a citizen on a matter of public concern at the workplace, and may speak as an employee away from the workplace." *Id.* at 407. While "[t]he inquiry into the protected status of speech is one of law, not fact," *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983), such status "must be determined by the content, form, and context of a given statement, as revealed by the whole record," *id.* at 147-48.

The Amended Complaint alleges that Ridpath was relieved of his teaching duties for, *inter alia*, "speaking out against [the University's] conduct during the NCAA infractions process." Amended Complaint at ¶ 61. It does not specify whether Ridpath's remarks concerned the

---

[26]The *McVey* test fleshes out the balancing test first articulated by the Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and further explained in later decisions. The *McVey* test's first prong, whether the employee's speech addressed a matter of public concern, is "[t]he threshold question." *See Rankin v. McPherson*, 483 U.S. 378, 384 (1987). The second prong, whether the employee's interest in speaking outweighed the employer's interest in the efficient provision of public services, embodies *Pickering*'s original formula. *See Pickering*, 391 U.S. at 568. The *McVey* test's third prong, causation, requires the employee to demonstrate a sufficient nexus between the protected speech and an adverse employment action by the employer. *See Huang v. Bd. of Governors*, 902 F.2d 1134, 1140 (4th Cir. 1990) (requiring employee to show "but for" connection).

University's treatment of Ridpath, its general response to the NCAA rules violations, or its perpetration of the underlying violations. Nevertheless, a district court may reject a claim at the Rule 12(b)(6) stage only if "it appears beyond all doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001). Allegations of NCAA rules violations by a prominent sports program at a major public university, and the nature of the university's handling of such allegations, are matters of great "social, political, or other interest to a community." *See Urofsky*, 216 F.3d at 406. We therefore cannot say that Ridpath will be unable to build a factual record which demonstrates that his remarks were on a matter of public concern. Moreover, the Amended Complaint supports the inference that Ridpath commented on the University's conduct during the NCAA infractions process in a personal capacity and not as a representative of the University. Accordingly, Ridpath has sufficiently alleged that he was speaking as a private citizen on a matter of public concern and satisfied the first prong of the *McVey* test.[27]

ii.

Under the *McVey* test's second prong, commonly referred to as "*Pickering* balancing," we must assess whether the Amended Complaint has sufficiently alleged that Ridpath's interest in First Amendment expression outweighed the University's interest in the efficient provision of public services. *See McVey*, 157 F.3d at 277. For *Pickering* balancing, "we must take into account the context of the employee's speech" and "the extent to which it disrupts the operation and mission" of the institution. *Id.* at 278. Factors relevant to this inquiry include whether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institu-

---

[27]The Amended Complaint also alleges that Ridpath was relieved of his teaching position for "retaining counsel and filing a civil action in response to . . . constitutional violations." Amended Complaint at ¶ 62. In their appeal, the Administrators have not challenged Ridpath's position that his filing of a civil action constituted protected speech.

tion; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the institution; and (9) abused the authority and public accountability that the employee's role entailed. *Id.*[28]

Here, we cannot say that Ridpath will be unable to show that his interest in First Amendment expression outweighed the University's interest in the efficient operation of his workplace. Nothing in the Amended Complaint indicates, for example, that his comments impaired the maintenance of discipline, hurt workplace morale, or constituted an abuse of his position. Moreover, the Administrators have not suggested how — or even that — Ridpath's remarks interfered with the University's efficient operation.[29]

Once a factual record is developed through discovery, the evidence could support the inference that Ridpath's workplace was impaired as a result of his comments and that he simply had to be terminated from his adjunct teaching position. Such a question, however, is not to be assessed under Rule 12(b)(6) but in Rule 56 summary judgment proceedings. *See McVey*, 157 F.3d at 278-79 (affirming district court's decision to defer deciding qualified immunity until "record is better

[28]A majority of the *McVey* panel observed that both this Court and the Supreme Court have also included the value of the employee's speech to the public in the *Pickering* balance. *See McVey*, 157 F.3d at 279 (Murnaghan, J., concurring in part and concurring in the judgment) (emphasizing importance of considering public interest in *Pickering* balancing); *id.* at 282 (Michael, J.) (concurring "except to the extent . . . qualified by Judge Murnaghan's separate opinion"). Judge Murnaghan observed that, in *Connick*, the Supreme Court cautioned that "'a stronger showing [of employer interest] may be necessary if the employee's speech more substantially involved matters of public concern.'" *Id.* at 279 (quoting *Connick*, 461 U.S. at 152) (alteration in original). In the present analysis, however, we need not assess the value of Ridpath's speech to the public, as it would be difficult to calculate based on the Amended Complaint, and we can decide in Ridpath's favor without reaching it.

[29]Instead, the Administrators contend that the University was a more efficient place after Ridpath was relieved of his teaching position because the University no longer had to pay his salary and he had been an inefficient teacher.

developed" in part because complaint did not "resolve on its face" second prong of *McVey* test). At the Rule 12(b)(6) stage, Ridpath's allegations warrant the inference that his free speech interests outweigh the detrimental effect, if any, his comments may have had on the efficiency of his workplace. Indeed, read in the proper light, the Amended Complaint alleges that he was relieved of his adjunct teaching position for protected statements that had no impact on his workplace whatsoever. Accepting those allegations as true and giving Ridpath the benefit of the reasonable factual inferences, we cannot say that "it appears beyond all doubt that [Ridpath] can prove no set of facts" to tip the *Pickering* balance in his favor. *See Trulock*, 275 F.3d at 405. Accordingly, Ridpath has sufficiently shown that his interest in speaking outweighed the University's interest in promoting the efficient provision of public services, and he has satisfied the second prong of the *McVey* test.

iii.

Under the third prong of the *McVey* test, Ridpath must demonstrate a causal relationship between his protected speech and the termination of his teaching duties. *See McVey*, 157 F.3d at 277-78. The causation requirement is "rigorous" in that the protected expression must have been the "but for" cause of the adverse employment action alleged. *Huang v. Bd. of Governors*, 902 F.2d 1134, 1140 (4th Cir. 1990). As explained below, Ridpath's Amended Complaint has sufficiently alleged causation.

The Amended Complaint alleges that during related internal grievance proceedings, a University official "testified, under oath, that Dr. Ridpath's adjunct faculty position was terminated, in whole or in part, for his speaking out against [the University's] conduct during the NCAA infractions process." Amended Complaint at ¶ 61. It further alleges that Ridpath was relieved of his teaching position "in direct . . . retaliation for having exercised his First Amendment right to petition the government for redress of grievance by retaining counsel and filing a civil action in response to . . . constitutional violations." *Id.* at ¶ 62. Thus, the Amended Complaint alleges that Ridpath's protected speech was the "but for" cause of the termination of his teaching duties, satisfying the causation requirement embodied in the third prong of the *McVey* test. Having met each prong of the *McVey* test

at this stage, Ridpath has sufficiently alleged a First Amendment retaliation claim.

b.

We turn next to the second of Ridpath's free speech claims, the chilling claim. Under our precedent, "a public employer is prohibited from threatening to discharge a public employee in an effort to chill that employee's rights under the First Amendment." *Edwards v. City of Goldsboro*, 178 F.3d 231, 246 (4th Cir. 1999).[30] A chilling claim is essentially the derivative of a retaliation claim: if a public employer cannot fire, demote, or similarly punish a public employee for engaging in protected speech, the employer also cannot intimidate the employee into silence by threatening impermissible retribution.

According to the Amended Complaint, each of the Administrators warned that if Ridpath commented publicly on the NCAA investigation, he would face professional, as well as personal, repercussions. On November 1, 2001, Cottrill told Ridpath "[y]ou . . . have no say in the matter. You need to think about your family young man." Amended Complaint at ¶ 57(a). Grose then advised him: "I am telling you. You do anything to resurrect this [NCAA Infractions issues] and I will bury you personally and professionally." *Id.* (alteration in original). Later, Angel asserted at a meeting of University officials that if Ridpath commented on the "cheap shots" taken at him in the NCAA Infractions Report, Angel "would cut the dead limb from the tree." *Id.* at ¶ 57(b). Angel even elaborated on the point, asserting that he had handled similar situations before and would have "no problem firing [Ridpath] on the spot" if he commented on the investigation. *Id.* (alteration in original).[31]

---

[30]As the Supreme Court has explained, "the threat of dismissal from public employment is . . . a potent means of inhibiting speech." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968).

[31]On the face of the Amended Complaint, it is unclear whether Ridpath was at the meeting when Angel threatened to "fire [Ridpath] on the spot" and, if not, when and how he later learned of Angel's remarks. Reading the Amended Complaint in the proper light, however, we should infer that, if Ridpath was not present at the meeting, he was made aware of Angel's threats shortly thereafter.

Because the prohibition against the chilling of free speech derives from the prohibition against retaliation, we must utilize a *McVey*-type analysis to determine whether the speech at issue in the chilling claim is entitled to First Amendment protection. *See Edwards*, 178 F.3d at 245-49 (inquiring in single *McVey*-type analysis whether speech was protected for both retaliation and chilling claims). As discussed previously, the NCAA rules violations against the University, the University's response to the violations, and the University's treatment of Ridpath were matters of public concern. *See McVey*, 157 F.3d at 277 (requiring employee's speech to be on matter of public concern). Furthermore, the Administrators have, again, not asserted why — or even that — they feared the University's efficient operation might be harmed if Ridpath, who was no longer the Compliance Director, spoke publicly. *See id.* at 278 ("[W]e must take into account the context of the employee's speech including the employee's role in the institution and the extent to which it disrupts the operation and mission of the agency"). Accordingly, the speech at issue in the chilling claim is protected by the First Amendment.

Reading the statements attributed to the Administrators in the proper light, each of them was seeking to use his position at the University to intimidate Ridpath into silence. Under *Edwards*, the Administrators' misuse of the power vested in them by the University contravened Ridpath's free speech rights. Accordingly, Ridpath has alleged facts sufficient to support his chilling claim. As a result, each of Ridpath's free speech claims sufficiently states the violation of a First Amendment right, and each claim thus survives the first prong of the qualified immunity test.

### 2.

Under the second prong of the qualified immunity test, we assess whether the free speech claims would contravene clearly established rights of which a reasonable person would have known. *See Mellen v. Bunting*, 327 F.3d 355, 365 (4th Cir. 2003). We apply this test to, first of all, Ridpath's retaliation claim and, secondly, to his chilling claim.

### a.

The Administrators contend that Ridpath's retaliation claim is not based on a clearly established First Amendment right. We are con-

strained to disagree. According to the Amended Complaint, Ridpath was relieved of his adjunct teaching position on July 14, 2003. *See* Amended Complaint at ¶ 59. At that time a long line of decisions, both the Supreme Court's and our own, established that a public employee could not be fired solely for making protected statements. *See, e.g.*, *Rankin v. McPherson*, 483 U.S. 378, 383 (1987) ("It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech."); *Connick v. Myers*, 461 U.S. 138, 142 (1983) ("For at least 15 years it has been settled that a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression."); *McVey v. Stacy*, 157 F. 3d 271, 277 (4th Cir. 1998) ("The First Amendment protects public employees from termination of their employment in retaliation for their exercise of speech on matters of public concern."). Furthermore, by the time Ridpath was relieved of his teaching position at the University, we had been applying the "*McVey* test" to such retaliation claims for more than a decade. *See, e.g., McVey*, 157 F.3d at 277-78; *Stroman v. Colleton County Sch. Dist.*, 981 F.2d 152, 156 (4th Cir. 1992). Thus, the prohibition against retaliation for protected speech was clearly established at the time Ridpath was relieved of his teaching position.

Our inquiry on this issue does not end here, however, because we must also examine whether reasonable persons would have been aware that relieving Ridpath of his adjunct teaching position for his remarks violated his constitutionally protected free speech rights. In making such a determination, we have aptly observed that "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *McVey*, 157 F.3d at 277 (internal quotation marks omitted). And because of the "sophisticated balancing" involved in First Amendment questions, "only infrequently will it be clearly established that a public employee's speech on a matter of public concern is constitutionally protected." *Id.* (internal quotation marks omitted). Still, public employers enjoy only qualified — not absolute — immunity, and a public employer can find no refuge in qualified immunity when an adverse employment decision clearly contravenes a public employee's First Amendment rights.

While further factual development in this case may present a murky picture of why Ridpath was relieved of his teaching position, the content and context of his statements, and any negative impact his remarks had on the efficiency of his workplace, the scene painted by the Amended Complaint is crystal clear. Read in the proper light, it alleges that the Administrators retaliated against Ridpath for making protected statements that they did not like. Such activity does not merely implicate the gray edges of the right Ridpath asserts; it goes to its very core. And taking the allegations of the Amended Complaint as true, a clearer violation of constitutionally protected free speech would be difficult to fathom. Therefore, Ridpath's retaliation claim alleges a violation of clearly established law of which a reasonable person would have known.[32]

b.

The Administrators similarly assert that Ridpath's chilling claim is not based on a clearly established First Amendment right. As previously discussed, comments by Ridpath concerning the NCAA rules violations, the University's response to those violations, or the University's treatment of Ridpath would be clearly protected. In *Edwards v. City of Goldsboro*, decided by us more than two years prior to the events alleged in the Amended Complaint, we held that, under the applicable legal principles, "a public employer is prohibited from threatening to discharge a public employee in an effort to chill that employee's rights under the First Amendment." 178 F.3d 231, 246 (4th Cir. 1999). Given this precedent, we are obliged to conclude that the Administrators' threats violated clearly established law of which reasonable persons would have known. Accordingly, the Administra-

---

[32]The Administrators assert on appeal that Ridpath's position was eliminated, and that "no reasonable official would have known that, by canceling a class because of budgetary concerns, he or she would be exposed to a First Amendment claim by an adjunct faculty professor." *See* Reply Br. of Appellants at 28-29. However, the Amended Complaint alleges that Ridpath was relieved of his teaching position at the University in retaliation for protected speech, *see* Amended Complaint at ¶¶ 61-62, and we cannot, under controlling Rule 12(b)(6) principles, accept the Administrators' contrary factual assertion.

tors are not entitled to qualified immunity on Ridpath's free speech claims at this stage in the proceedings.[33]

IV.

Pursuant to the foregoing, we dismiss the appeal of Coach Pruett and affirm the denial of qualified immunity to the Board and the Administrators.

*DISMISSED IN PART AND AFFIRMED IN PART*

WIDENER, Circuit Judge, concurring and dissenting:

As to Count I of the complaint, I respectfully dissent. As to Count II, I concur in the result. I concur in the dismissal of the appeal of Coach Pruett.

I respectfully dissent on account of the failure of the district court, and the majority in our case, to grant qualified immunity to the administrators at Marshall University with respect to the defamation count, Count I of the complaint.

The § 1983 claims are based on two incidents. The first is the NCAA infraction report of December 21, 2001, an advance copy of which had been supplied to the University sometime previously. That report described, at the instance of the University, the "transfer [. . . of] the compliance director from athletics to another department at the university" as a "corrective action [. . .]"

The plaintiff claims such use, by the University, of the term "corrective action" is defamatory and has damaged his reputation so that his opportunities for employment within his chosen profession, college athletics, have been, or will be, damaged.

---

[33]Finally, the Appellants contend that Ridpath's free speech claims should be dismissed because he has not exhausted his state administrative remedies. However, as the Appellants only appealed qualified immunity rulings, we have no jurisdiction to review their administrative-exhaustion contention.

In the first incident, based on defamation, the record does not disclose the words which were used by the University in reporting to the NCAA Dr. Ridpath's transfer as a corrective action. Neither does it show whether that communication was oral or written.

I assume for the moment, for argument, that labeling Dr. Ridpath's transfer from the athletic department to be the Director of Judicial Programs could be defamatory when described as a corrective action, but that does not end the inquiry. Damage to Dr. Ridpath's reputation, which is the root cause of this law suit, is not actionable under § 1983.

The district court, in its opinion, described Dr. Ridpath's claim:

> Ridpath, on the other hand, contends that he has not alleged that he had a property interest in his employment at MU. Instead, he asserts that the 'corrective action' label assigned to his transfer to the position of Director of Judicial programs at MU without due process *has destroyed his reputation in the field of collegiate athletics* because that label is generally understood by those connected to college athletics to be a code term importing dishonesty and incompetence on the part of individuals to whom it is alleged. J.A. 242. (Italics added.)

In my opinion, this case is controlled by *Siegert v. Gilley*, 500 U.S. 226 (1991). In that case, St. Elizabeths Hospital, a facility of the United States, notified Siegert, a clinical psychologist, that it was preparing to terminate his employment, giving as the reason that his "'proposed removal was based upon his inability to report for duty in a dependable and reliable manner, his failure to comply with supervisory directives, and cumulative charges of absence without approved leave.' . . . After meeting with hospital officials, Siegert agreed to resign from the hospital and thereby avoid a termination that might damage his reputation." 500 U.S. at 228. Siegert then began work as a clinical psychologist in a United States Army hospital in Bremerhaven, West Germany. At that Army hospital, he signed a credential information request form, asking that St. Elizabeths provide all information on job performance and privileges while at St. Elizabeths. Siegert's request was referred to Gilley, who had been Siegert's supervisor at St. Elizabeths. Gilley notified the Army that

"he could not recommend [Siegert] for privileges as a psychologist." . . . In that letter, Gilley wrote that he "considered Dr. Siegert to be both inept and unethical, perhaps the least trustworthy individual I have supervised in my thirteen years at [St. Elizabeths]." 500 U.S. at 228.

After receiving Gilley's letter, the Army told Siegert that because reports about him were extremely unfavorable, its Credential Committee was recommending that he not be credentialed. He later was given provisional credentials limited to his work with adults. Siegert's suit against Gilley followed. Siegert contended that "the loss of his position at the Bremerhaven Hospital, followed by the refusal of the Army hospital in Stuttgart to consider his application for employment, and his general inability to find comparable work because of Gilley's letter, constituted such a deprivation [of a 'liberty interest' secured by the Fifth Amendment to the United States Constitution]." 500 U.S. at 232.

The Court decided that injury to reputation is not an interest protected under the Constitution. "Defamation, by itself, is a tort actionable under the laws of most States, but not a Constitutional deprivation." 500 U.S. at 233. The Court reasoned that

> The statements contained in the letter would undoubtedly damage the reputation of one in his position, and impair his future employment prospects. . . . But so long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a *Bivens* action. 500 U.S. at 234.

The court affirmed the dismissal of Siegert's *Bivens* claim, and its holding was explicit and free from doubt:

> We hold that the petitioner in this case [Siegert] failed to satisfy the first inquiry in the examination of such a claim; he failed to allege the violation of a clearly established constitutional right. 500 U.S. at 231.

And the Court noted, at 229 and 234, that Siegert did not make a claim of diverse citizenship to prosecute a claim for defamation. We

note that Dr. Ridpath has made no state law claim for defamation here. If Dr. Ridpath had wished to bring a defamation suit for slander or libel in a court of appropriate jurisdiction, he might have done so, but that is not a question before us.

I note that, in *DiMeglio v. Haines*, 45 F.3d 790 (4th Cir. 1995), a § 1983 case as here, we followed *Siegert* and held "[i]n deciding qualified immunity claims, courts should determine whether the plaintiff has alleged the violation of a constitutional right that was clearly established at the time of the defendant's actions, before they proceed to address any ancillary issues." 45 F.3d at 797.

In my opinion, the facts in the *Siegert* case and the facts in the present case are so nearly the same that *Siegert* must control. The defamatory language in *Siegert* is equally as defamatory as that claimed here; the claims of Siegert and Dr. Ridpath are each based on due process, whether under the Fifth Amendment or the Fourteenth, is a matter of indifference; and both Siegert and Dr. Ridpath claim that resulting damage is because of injury to reputation, which the Court held not actionable under *Siegert* as a Constitutional deprivation. 500 U.S. at 233.

No violation of a Constitutional right having been established, qualified immunity should have been granted as to the defamation claim. *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991); *Kitchen v. Upshaw*, 286 F.3d 179, 189 (4th Cir. 2002); *DiMeglio*, 45 F.3d at 808.

As for the second incident, Count II of the complaint, based on free speech, I concur in the result on the basis of our decision in *McVey v. Stacy*, 157 F.3d 271 (4th Cir. 1998). In *McVey*, the district court had declined to dismiss the First Amendment claim, as here, and it rejected qualified immunity "at this stage in the litigation" because "the record had not been developed." *McVey*, 157 F.3d at 275. Our decision was to "affirm the district court's ruling to defer deciding on the qualified immunity issue until the record is better developed on the immunity issues." *McVey*, 157 F.3d at 279. I continue to disagree with the majority that the complaint alone justifies a finding that Ridpath spoke as a citizen rather than as an employee, largely because he had been instructed by his superiors not to speak out publicly. See

*Connick v. Myers*, 461 U.S. 138, esp. p.147, (1983) (deciding for the State, the Court found, at p.150, "The *Pickering* balance requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public."); and *DiMeglio v. Haines*, 45 F.3d 790 (4th Cir. 1995) (holding a municipal government employee's remarks may not be protected under *Connick* if he was speaking as an employee, rather than as a citizen). Nevertheless, I believe a concurrence in the result is more in order than a dissent in view of the majority's decision that the matter is not closed. See footnote 23, supra. So any present error on this account is harmless.